# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE SERVE COFFEE ANTITRUST LITIGATION | : : : : : : : : | ECF Case<br><br>1:14-md-2542-VSB-HBP<br><br>MDL No. 2542 |
| ------------------------------------------------ X | | |
| JBR, INC. (D/B/A ROGERS FAMILY COMPANY),<br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>KEURIG GREEN MOUNTAIN, INC. (F/K/A GREEN MOUNTAIN COFFEE ROASTERS, INC. AND AS SUCCESSOR TO KEURIG, INC.),<br>　　　　　　　Defendant. | : : : : : : : : : : X | 1:14-cv-04242-VSB-HBP<br><br>**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**REDACTED** |
| ------------------------------------------------ | | |

# TABLE OF CONTENTS

**Page**

JURISDICTION AND VENUE ................................................................................. 1

THE PARTIES..................................................................................................... 2

INTRODUCTION .................................................................................................. 3

RELEVANT MARKETS .......................................................................................... 5

    A.    Relevant Product Markets................................................................. 5

        1.    The Single Serve Brewers Market ....................................... 5

        2.    The Compatible Portion Packs Market ................................. 8

        3.    The Portion Packs Market ................................................. 12

        4.    Market Segments .............................................................. 14

            a.    Branded Portion Packs Market .................................. 14

            b.    Private Label Portion Packs Market ........................... 14

            c.    The At-Home Market Segment.................................... 15

            d.    The Away-From-Home Market Segment ...................... 16

    B.    Geographic Market ......................................................................... 18

    C.    Interstate Commerce ...................................................................... 18

KEURIG'S ANTICOMPETITIVE CONDUCT ............................................................. 19

    A.    Keurig Coerced Customers Into Entering Exclusive Agreements....................... 19

        1.    Exclusive Agreements With Away-From-Home Market Distributors ...................................................................... 19

        2.    Exclusive Agreements With At-Home Distributors ................. 25

        3.    Exclusive Agreements With Roasters..................................... 26

    B.    Keurig Aggressively Acquired Its Competitors.................................... 39

    C.    Keurig Vigorously Pursued Objectively Baseless Patent Claims Against Its Competitors................................................................... 40

    D.    Keurig 2.0 Is A Predatory Technology That Further Ties Keurig K-Cups to Brewers And Locks Competitors Out of The Market..................... 43

        1.    Developing The Authentication Mechanism ........................... 43

        2.    Keurig Implemented Its Lockout Plan by Introducing the Taggant Technology in Its 2.0 Brewer and Creating a Pre-Launch Marketing Campaign That Cut Off Competitors from the Market Through Customers' Fear, Uncertainty and Doubt................................. 47

**TABLE OF CONTENTS**
(continued)

Page

3.      Keurig Used the Impending Release of the 2.0 Brewer to Compel
        Resellers to Discontinue Purchases of Competing Portion Packs ........... 50

4.      Keurig Knowingly Makes False Claims That Its Lockout
        Technology Has Consumer Benefits When In Reality There Is No
        Procompetitive Justification or Product Improvement Resulting
        From The Lock Out Function .................................................................. 53

E.    Keurig Has Made and Continues to Make False and Disparaging
      Statements About Competing Portion Packs ....................................................... 57

      1.    Marketing to End-User Customers and Consumers................................. 57

      2.    Marketing to Retail Customers ............................................................... 61

THE HARM CAUSED BY KEURIG'S ANTICOMPETITIVE CONDUCT ........................... 64

CLAIMS FOR RELIEF ....................................................................................................... 72

    FIRST CLAIM FOR RELIEF ....................................................................... 72

    SECOND CLAIM FOR RELIEF ................................................................... 75

    THIRD CLAIM FOR RELIEF ....................................................................... 76

    FOURTH CLAIM FOR RELIEF ................................................................... 77

    FIFTH CLAIM FOR RELIEF ........................................................................ 80

    SIXTH CLAIM FOR RELIEF........................................................................ 81

    SEVENTH CLAIM FOR RELIEF ................................................................. 83

    EIGHTH CLAIM FOR RELIEF .................................................................... 85

    NINTH CLAIM FOR RELIEF ....................................................................... 86

    TENTH CLAIM FOR RELIEF ...................................................................... 87

    ELEVENTH CLAIM FOR RELIEF .............................................................. 89

    TWELFTH CLAIM FOR RELIEF................................................................. 90

    THIRTEENTH CLAIM FOR RELIEF .......................................................... 91

    FOURTEENTH CLAIM FOR RELIEF ......................................................... 91

    FIFTEENTH CLAIM FOR RELIEF .............................................................. 92

    SIXTEENTH CLAIM FOR RELIEF ............................................................. 93

    SEVENTEENTH CLAIM FOR RELIEF ....................................................... 94

PRAYER FOR RELIEF ...................................................................................................... 94

JURY TRIAL DEMANDED............................................................................................... 95

-ii-

Plaintiff JBR, Inc. (d/b/a Rogers Family Company) ("Rogers" or "Plaintiff") brings this action for damages and permanent injunctive relief against Defendant Keurig Green Mountain, Inc. ("Keurig" or "Defendant"), f/k/a Green Mountain Coffee Roasters, Inc. ("GMCR") and as successor to Keurig, Incorporated.  Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction over the First through Eleventh Claims for Relief, which seek relief pursuant to Section 3 of the Clayton Act (15 U.S.C. § 14), Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1, 2), and Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.  This Court has jurisdiction over the remaining Claims for Relief pursuant to the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because the remaining Claims for Relief all arise from the same transactions and from a common nucleus of operative facts.

2.      This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

3.      This Court has personal jurisdiction over Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391.  This Court also has personal jurisdiction over Keurig because Keurig regularly does and solicits substantial business in New York, either directly or through intermediaries, is continuously and systematically present in New York, and has established minimum contacts with New York, in particular by registering to do business in the state of New York in 2003, maintaining a registered agent for service of process in New York, doing substantial business with third parties in New York, maintaining a distribution center in New York, and banking with financial institutions in New York.  In light of Keurig's substantial contacts with New York, the exercise of jurisdiction over Keurig would not offend traditional notions of fair play and substantial justice.  Furthermore, Keurig's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Rogers and consumers in this District.

1

4.      Rogers also brings this action pursuant to California's Cartwright Act, Cal. Bus. and Prof. Code §§ 16720, et seq. and California's Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200, et. seq.  Defendant regularly conducts and solicits substantial business in California and has established minimum contacts with California.  In particular, GMCR has been registered to do business in the state of California since at least 1999, maintains a registered agent for service of process in California, does substantial business with third parties in California, and maintains a production facility in Castroville, California.  Similarly, Keurig, Inc. has been registered to do business in the state of California since at least 1999, maintains a registered agent for service of process in California, and does substantial business with third parties in California.  Furthermore, Defendant's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Plaintiff, a company headquartered in California. The effects of the unlawful conduct alleged below impacted Plaintiff, as well as consumers, in California.  For these reasons, Rogers is entitled to the protections of California law. This Court has supplemental jurisdiction over Plaintiff's claims under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and California law.

## THE PARTIES

5.      Rogers is a California corporation with its principal place of business in Lincoln, California.  Rogers is a privately held, 100% family-owned roaster, packager, and seller of coffee products, including individual portion packs for single serve coffee brewers.  Rogers has been selling premium, sustainably grown coffees and teas for over 32 years.

6.      Keurig is a corporation organized under the laws of the State of Delaware with a principal place of business in Waterbury, Vermont.   Until March 6, 2014, Keurig Green Mountain, Inc. was known as Green Mountain Coffee Roasters, Inc.  Keurig Green Mountain, Inc. is the successor to Keurig, Inc., which prior to its merger with and into Green Mountain Coffee Roasters, Inc. on December 31, 2013, was a wholly-owned subsidiary of Green Mountain

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

Coffee Roasters, Inc. organized under the laws of the State of Delaware with a principal place of business in Reading, Massachusetts.

7.     On information and belief, additional persons and/or entities that are not currently named Defendants participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  As detailed in Paragraphs 77-81 below, Sagentia participated in and furthered Keurig's exclusionary and unlawful strategy to lock out competitors for the Keurig 2.0 brewer by engineering incompatibility with Competing Portion Packs into the machine.  Various suppliers, roasters, beverage brands, distributors and retailers, including those identified in Paragraphs 87-154 below and, on information and belief, many others currently unknown to Plaintiff, entered into anticompetitive agreements with Keurig that limit or exclude competition from competing Portion Pack suppliers and unreasonably restrain trade and create, enhance and/or maintain Keurig's monopoly power in violation of Sections 1 and 2 of the Sherman Act and corresponding state laws.  On information and belief, other persons and/or entities that are currently unknown to Plaintiff are co-conspirators of Keurig and made statements or took actions to further Keurig's anticompetitive scheme alleged herein. Plaintiff reserves the rights to name any or all of these persons and/or entities as defendants in the future.

## INTRODUCTION

8.     Defendant Keurig, at the direction of its senior management and as ratified by its Board of Directors, has engaged and continues to engage in a scheme of anticompetitive acts to block independent competitors from the markets in which it operates.

9.     Specifically, Keurig has monopolized the market for the sale of pressurized hot water brewing equipment that is capable of brewing at least a single serving of coffee or other hot beverages ("Single Serve Brewers" – defined in greater detail below).  Keurig has also monopolized the market for the sale of disposable cartridges, capsules, pods, or packs containing pre-measured beverage portions that are used in Single Serve Brewers to prepare a wide variety of beverages and food products ("Portion Packs"), as well as the market for the sale of the most

3

popular type of Portion Pack, "K-Cup" compatible portion packs ("Compatible Portion Packs" – defined in greater detail below), which are disposable pods or cups that are compatible with one or more Single Serve Brewers manufactured or licensed by Keurig for use with K-Cups ("K-Cup Brewers").

10.     Keurig primarily competes for brewer sales with a small number of manufacturers.  Keurig's K-Cup Brewers are designed to use a low-pressure brewing method, rather than other types of brewers that brew espresso (which requires a high-pressure brewing method) or use either a hopper to store coffee beans or a drip brewing system.

11.     Keurig considers its low-pressure brewers to give it a competitive advantage in the marketplace and it protects this competitive advantage by a variety of anticompetitive actions.

12.     Keurig uses its agreements with suppliers, distributors, and retail customers to restrict them from buying "Competitive Brewers" (defined below) or "Competing Portion Packs" (defined below).

13.     Keurig explains that "competing systems" have the following characteristics: (1) "A brewing chamber designed to be pierced during the brewing process to allow hot water in and the brewed beverage out;" and (2) "A pressurized brewing process that takes place at pressures less than 30 psi inside the brewing chamber" ("Competitive Brewers").  *See* Exhibit 1, Section 5 at 7 (2011 Am. and Restated Purchase and License Agreement between Green Mountain and Caribou Coffee Company, Inc., dated  Dec. 20, 2011); ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14.     Keurig's agreements define what is and what is not "competing systems." Specifically, Keurig admits that:

> Examples of … systems that would be competitive include single-cup portion pack coffee systems such as those manufactured by Flavia, Kenco and Braun (the Tassimo system).  **Examples of systems that would not be competitive are hopper-based**

4

> **single-cup coffee systems such as those manufactured by Filterfresh and Brio and espresso pod-based systems such as Illy pod espresso machines, Café Espresso and 123spresso systems.**

*See* Exhibit 1 Section 5 at 7 (2011 Am. and Restated Purchase and License Agreement between Green Mountain and Caribou Coffee Company, Inc., dated Dec. 20, 2011) (emphasis added).

15.     Keurig's monopoly power in the U.S. Single Serve Brewer and Portion Pack Markets is beyond dispute.  Keurig controls at least 89% of the Single Serve Brewers Market in the United States and 95% of the Compatible Portion Pack Market.

16.     Using this monopoly power and other anticompetitive market manipulation throughout the U.S., Keurig successfully embarked on a decade-long scheme to extend its monopoly from the Single Serve Brewers Market to the Portion Pack Market.  In doing so, Keurig has employed a variety of anticompetitive strategies to gain its market dominance and to prevent competition.

## RELEVANT MARKETS

### A.     Relevant Product Markets

17.     The Relevant Markets include: (1) the market for the design, manufacture and sale of Single Serve Brewers ("Single Serve Brewers Market"), (2) the market for the design, manufacture, and sale of Compatible Portion Packs ("Compatible Portion Packs Market"), and (3) the market for the design, manufacture, and sale of Portion Packs ("Portion Packs Market").

18.     In each of these Relevant Markets, Keurig maintains monopoly power evident by supracompetitive prices and market dominance.

### 1.     The Single Serve Brewers Market

19.     Keurig introduced the first commercially successful Single Serve Brewer to the United States market in or around 1998.  Since this initial introduction, Keurig has designed, manufactured and sold a variety of different Single Serve Brewers marketed either for use in the individual consumer's home or for use outside of the home at locations such as office buildings, hotels and gas stations.

5

20.     Single Serve Brewers provide consumers a quick, convenient and simple way to brew one or more servings of coffee, cocoa, cappuccino, cider, or other products encapsulated in a Portion Pack.  Single Serve Brewers quickly brew coffee, tea, and other hot beverages without requiring the consumer to grind beans, measure beverage mixes, handle used filters, or clean up after the beverage is prepared.

21.     Purchasers do not consider other products, such as traditional drip coffee, French press coffee, single-cup pour-over cones, instant coffee packets, or traditional teas, to be reasonably interchangeable with Single Serve Brewers for the purposes for which Single Serve Brewers are used.  An early study by Keurig found that the vast majority of consumers were drawn to the convenience, quick-brewing, ease of use and minimal clean up, offered by Single Serve Brewers particularly compared to other home brewing systems.  Most consumers that purchase Single Serve Brewers do so because of the convenience they offer.  Surveys consistently find that the Single Serve Brewers are differentiated from other brew methods because of the speed of brewing and convenience of preparation and clean-up.

22.     Moreover, Single Serve Brewers now allow consumers to prepare many more products than traditional coffee makers.  For example, Single Serve Brewers can also be used to make tea, cider, cocoa, and other hot beverages.

23.     Because of Single Serve Brewers' distinct attributes, it is of little surprise that Single Serve Brewers do not exhibit strong, positive cross-elasticity of demand with respect to the price of lower cost traditional drip coffee makers.  Traditional drip coffee makers are frequently sold around a price point of approximately $30 to $35, while Single Serve Brewers typically cost between $80 to several hundred dollars.  The average drip brewer price from July 2013 to July 2014 was $27, while the average price of Single Serve Brewers for the same period was $103.  Of note, Keurig has priced its new generation 2.0 Brewers even higher than the average Single Serve Brewer, at $149.99 (for the K350 Brewer), $169.99 (for the K450 Brewer) and $199.99 (for the K550 Brewer).

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

24.     Despite this significant and increasing price difference, the share of Single Serve Brewers has risen significantly unconstrained by the cheaper prices of traditional drip brewers. In 2013, Single Serve Brewer sales revenue in the U.S. was approximately $930 million, with the Single Serve Brewers Market growing at a rate of 7% per annum.   Meanwhile, the traditional drip-coffee brewer market has remained relatively stagnant.

25.     Single Serve Brewers also do not compete in the same market as prepared coffee purchased at retail outlets such as coffee shops where beverages are prepared on the spot for customers.  As demonstrated by industry statistics, the functionality of a Single Serve Brewer is simply not replaceable by retail-prepared coffee:  the share of coffee consumed outside of the house has remained at around 15% to 20% over the last fifteen years, and has actually increased since Keurig's introduction of the Single Serve Brewer in 2004.

26.     Notably, surveys have shown that increased consumption of coffee from Single Serve Brewers has primarily *added* to consumers' overall coffee consumption, rather than taking or substituting away from the consumption of other forms of brewed coffee.

27.     Keurig has monopoly power in the Single Serve Brewer Market.  It controls approximately 89% of total unit sales and 93% of total dollar sales in the Single Serve Brewer Market.  Market analysts have widely described the Keurig market position as "dominant" and do not believe a new entrant could gain a meaningful share.  Keurig has maintained a market share of approximately 90% or more of the Single Serve Brewer Market since at least 2011.

28.     In Keurig's fiscal year 2014, Defendant sold 10.4 million new brewers, bringing its total brewer sales to approximately 40 million, and giving Keurig an install base that includes roughly 20 million households.

29.     There are significant barriers to entry into the Single Serve Brewers Market. Successful entry into the Single Serve Brewers Market requires access to significant capital, substantial technological knowledge and design capabilities, and access to distribution channels, which requires the fostering of relationships with retailers and distributors.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

30.     Upon information and belief, many retailers and distributors of Single Serve Brewers are prohibited from purchasing Single Serve Brewers from entities other than Keurig as a result of their distribution agreements with Keurig.  Keurig has exercised its power to exclude competition in the Single Serve Brewer Market by coercing distributors and retail customers to enter into anticompetitive exclusive agreements, which require that only Keurig-branded brewers be sold or used by these entities.  Keurig has also excluded competition in the Single Serve Brewer Market by contractually prohibiting coffee roasters and beverage brands — Keurig's potential competitors in the Single Serve Brewer Market — from either making K-Cup Brewers or dealing with existing K-Cup Brewer makers.

### 2.     The Compatible Portion Packs Market

31.     The second product market in which to evaluate Keurig's anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Portion Packs.  Because Portion Packs are not generally compatible across different types of Single Serve Brewers, (e.g., Compatible Portion Packs will not work in a Tassimo brewer and T-Discs will not work in a K-Cup Brewer), the various types of Portion Packs are not reasonably interchangeable with one another.  Presently, Keurig (1.0) Brewers are designed to be compatible with:  (1) single-serve Portion Packs sold by Keurig under its brand name as well as those sold under its licensees' brand names ("K-Cups"); and (2) Portion Packs manufactured, distributed and sold by Keurig's competitors ("Competing Portion Packs') (together with K-Cups, "Compatible Portion Packs") (in other words, Portion Packs that would be compatible with K-Cup Brewers, but for the lock out technology designed to prevent Competing Portion Packs from operating in 2.0 Brewers).

32.     There are generally two types of Compatible Portion Packs:  the K-Cup-style plastic capsules that are made by Keurig, its licensees, and TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc., and Portion Packs that are not encapsulated with plastic, but rather use a soft mesh material to enclose the ingredients, such as those that are made by Rogers.

33.     The Compatible Portion Pack Market comprises both K-Cups, which are made or licensed by Keurig, and Competing Portion Packs, which are made by a small and dwindling

8

number of Compatible Portion Pack makers that are not associated with Keurig.  Competing Portion Pack makers are often described as "unlicensed" because they have refused to take an illegitimate license from Keurig that would force Competing Portion Pack makers to pay an unjustified royalty to Keurig and to limit the output of Competing Portion Packs sold.

34.     Prior to 2010, virtually all of the Compatible Portion Packs on the market were K-Cup Branded Portion Packs and were manufactured by Keurig.  As such, Keurig had control of approximately 100% of the market for Compatible Portion Packs.

35.     In or around September 2010, however, Sturm Foods, Inc. ("Sturm"), a subsidiary of TreeHouse, began manufacturing and selling Compatible Portion Packs that did not utilize the filter technology protected under K-Cup patents and thus did not require licensing from Keurig.

36.     In October 2011, Rogers introduced to the market its first Compatible Portion Packs for use in K-Cup Brewers, in its proprietary OneCup format under its "San Francisco Bay" and "Organic Coffee Company" brands.  Rogers' initial version of OneCup reduced the environmental footprint and contained 30 to 35 percent less packaging than other Compatible Portion Packs.  In October 2013, Rogers introduced the world's first 97 percent biodegradable Compatible Portion Packs.

37.     Keurig has acknowledged that the Compatible Portion Pack Market is distinct from the Portion Pack Market in that Compatible Portion Packs do not face competition for use in K-Cup Brewers from Portion Packs that are incompatible with the K-Cup format.

38.     Small but significant non-transitory increases in the price of Compatible Portion Packs do not significantly increase demand for T-Discs (defined below), capsules, or other types of Portion Packs that are incompatible with K-Cup Brewers.  The reason for this is that most consumers of Compatible Portion Packs own or otherwise utilize a K-Cup Brewer, and are sufficiently locked into its use to find it impractical to switch to another Single Serve Brewer that utilizes a different Portion Pack.  Thus, the prices of T-Discs, capsules, or other Portion Packs that are incompatible with K-Cup Brewers do not reasonably constrain the price of Compatible Portion Packs.

9

39.     As Keurig's CEO admitted, Keurig's K-Cup prices are insulated from rising coffee commodity costs due to a built-in price premium and thus "single-cup pricing has continued to premiumize the category regardless of what the commodity prices of coffee have done.

40.     Moreover, both Keurig's methods of selling and promoting K-Cup Brewers, and the requirements that it imposes upon retailers often serve to obscure the total price of purchasing a K-Cup Brewer and corresponding Compatible Portion Packs, so that it is unrealistic for consumers of Compatible Portion Packs to consider other types of Portion Packs before being locked into the K-Cup Brewer format.

41.     While K-Cups and K-Cup Brewers are sold as separate products in many stores and online, Keurig typically sells K-Cup Brewers bundled with K-Cups, which makes it difficult for consumers to determine the price of the K-Cups when they originally purchase their K-Cup Brewers.  For example, Keurig sells 2.0 Brewers at mass merchandisers, such as Costco and Sam's Club, bundled with four K-Carafe packs and 42 or 48 K-Cups.  And on the Keurig.com website, each of the 2.0 Brewers come with four K-Carafe packs and six K-Cups.  Therefore, consumers purchasing a K-Cup Brewer do not need to purchase K-Cups at the same time in order to immediately begin using the brewer.

42.     Furthermore, consumers considering purchasing a Single Serve Brewer would not necessarily compare Compatible Portion Pack prices with the prices of other types of Portion Packs because Single Serve Brewers and Portion Packs are typically sold in different sections of retail stores.  Generally, brewers are sold in the appliance section or aisle, while Portion Packs are sold in the grocery section or aisle.

43.     Also, many owners of a K-Cup Brewer received it as a gift such that the initial decision to buy the brewer is disconnected from consideration of the long-term costs of Portion Packs.  As Keurig has admitted, almost half of all K-Cup Brewers sold in fiscal year 2013 were sold during the holiday season.  5.1 million K-Cup Brewers were sold in Keurig's first quarter of 2014 (which includes the end of the calendar year).

44.     Consumers, however, have been willing to switch from K-Cups to Competing Portion Packs to take advantage of new brand offerings, substantially lower pricing, and/or improved quality.  Indeed, market reports have found that consumers in the Compatible Portion Packs Market have a high degree of price sensitivity and are willing to try a new brand if it is less expensive. A 2013 market study concluded that 91.3% of Keurig users would try a new Compatible Portion Pack brand if it were less expensive.

45.     Keurig's consolidated net sales attributable to K-Cups were approximately $2.7 billion in 2012 and approximately $3.2 billion in 2013.

46.     Keurig has publicly acknowledged that until the second decade of 2010, it controlled 100% of the Compatible Portion Pack Market.  Although that market share briefly eroded to about 85% as of February 2014, Keurig's anticompetitive practices have allowed it to recapture the large majority of that market share over the second half of 2014.  As of November, Keurig now controls approximately 95% of the Compatible Portion Pack Market.

47.     Keurig has increased its monopoly power by launching the 2.0 Brewer, which contains lock out technology preventing 2.0 Brewers from functioning with Competing Portion Packs produced by firms that have not successfully reverse-engineered the lock out technology, and by replacing nearly all existing K-Cup Brewers sold by Keurig with the 2.0 Brewer.  Indeed, Keurig sold over 150,000 2.0 Brewers in the first quarter that it was on the market

48.     Potential entrants to the Compatible Portion Packs Market face significant barriers to entry.  A potential entrant must either (i) design Portion Packs that work in an existing Single Serve Brewer; or (ii) develop its own Single Serve Brewer.

49.     Designing Compatible Portion Packs that will work in an existing Single Serve Brewer requires significant technological and design skill and experience.  The Compatible Portion Pack must be manufactured in accordance with specific dimensions.  On information and belief, only a few manufacturers in the world have established the capability to design a Portion Pack that is compatible with a K-Cup Brewer.  To date, Rogers has invested approximately ███ ███ to purchase the equipment necessary to make Compatible Portion Packs.

11

50.     Additional barriers to entry include gaining access to the limited regional and nationwide distribution network for these types of products.  The primary sales channels for Compatible Portion Packs include (1) large wholesale distributors such as Costco, Sam's Club, and BJ's Wholesale Club, (2) large chain grocery stores such as Safeway and Kroger that typically only sell Compatible Portion Packs and not Single Serve Brewers, (3) chain stores with appliance departments such as Bed Bath and Beyond and Wal-Mart that sell both Single Serve Brewers and Compatible Portion Packs, (4) online retailers, and (5) distributors that sell coffee products to office buildings, hospitality businesses and other commercial customers.

51.     Furthermore, potential entrants to the Compatible Portion Packs Market also face the significant barrier of acquiring access to the distributor, retailer and online distribution channels, which require industry knowledge and the development of relationships with these distributors.  Access to these distribution channels is made more difficult, if not impossible, by Keurig's requirements that certain retailers and distributors enter into distribution agreements that prohibit them from purchasing Competing Portion Packs.

52.     The Compatible Portion Packs Market includes at least two large market segments, including one covering Compatible Portion Packs purchased by consumers for use at home in their K-Cup Brewers ("At-Home Market Segment") and one covering Compatible Portion Packs purchased for use outside the home (the "Away-From-Home Market Segment"). Keurig itself divides the market into "At Home" and "Away From Home" markets, and discusses submarkets within these two categories, for example stating, "unlicensed share differs widely by channel."

### 3.     The Portion Packs Market

53.     Instead of using Compatible Portion Packs, some Single Serve Brewers use Portion Packs that do not fit in K-Cup Brewers and have a different shape than Compatible Portion Packs.  For example, Hamilton Beach's Gevalia brewer and Philips Electronic N.V.'s Senseo brewer use a flat pod-style Portion Pack, and Bosch's Tassimo brewer utilizes a disc-like Portion Pack referred to as a T-Disc.  Once a consumer purchases a K-Cup Brewer, that

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

consumer generally cannot use other types of Portion Packs in the K-Cup Brewer.   Thus, consumers do not view T-Discs or flat pod-style Portion Packs as reasonably interchangeable with Compatible Portion Packs for use in K-Cup Brewers.

54.   Because Portion Packs that do not work in K-Cup Brewers are not reasonably interchangeable for the use of Compatible Portion Packs in Single Serve Brewers, the Compatible Portion Packs Market is the appropriate relevant market in which to evaluate the harm caused by Keurig's unlawful and anticompetitive conduct to competition for the manufacturing, licensing, and sale of Portion Packs that compete with K-Cups, *i.e.*, Competing Portion Packs.

55.   However, because the K-Cup format is by far the most dominant Portion Pack format and Keurig controls the dominant share of Compatible Portion Packs, Keurig's unlawful and anticompetitive conduct harms competition even across a broader, alternative market for the design, manufacture, and sale of *all* Portion Packs that are used in Single Serve Brewers.

56.   The Portion Packs Market is a distinct market from the market for packaged coffee generally (*i.e.*, packages of ground and whole bean coffee used by consumers to brew coffee in traditional drip or other multi-cup coffee manufacturers, e.g., percolators).   Ground coffee that is not sold in Portion Packs does not constrain the prices charged in the market for Portion Packs for several reasons:  (a) ground coffee not sold in Portion Pack form cannot be used in a Single Serve Brewer; (b) the price-per-pound of the coffee contained in Portion Packs is nearly five times greater than that of ground coffee of similar quality sold in other formats; and (c) the purchasing decisions of consumers who utilize Single Serve Brewers generally are motivated by the convenience and efficiency of disposable, single use Portion Packs.

57.   Further, the commodity price of coffee does not have the same effect on the price of Portion Packs that it does on packaged ground coffee.   Keurig itself admits that K-Cup prices are insulated from rising coffee commodity costs due to a built-in price premium, and that single-cup pricing continues to "premiumize" the category regardless of what the commodity prices of coffee do.

13

58.     Using its monopoly in the Single Serve Brewer Market, Keurig is able to influence and control the Portion Packs Market.   As of early 2013, Keurig controls approximately 73% of the Portion Packs Market and thus maintains monopoly power in this Market.

59.     Keurig's share of the Portion Pack Market has risen as a result of its many agreements with private label customers and unlicensed brands.   While Keurig controlled approximately 73% of the Portion Pack Market in early 2014, Keurig's lucrative deals with major former competitors like Peet's and Kraft has strengthened its share of the Compatible Cup Market and therefore, by implication, the Portion Pack Market.

60.     The same significant barriers to entry explained above with regard to the Compatible Portion Packs Market are equally applicable to the Portion Packs Market, including large capital expenditures and significant technological and design skill and experience required for the mass production of Portion Packs.

### 4.     Market Segments

#### a.     Branded Portion Packs Market

61.     The Branded Portion Packs Market consists of Compatible Portion Packs that are manufactured by Compatible Portion Pack manufacturers and sold under their own brand names. For example, Rogers' Branded Compatible Portion Packs are sold under the brands "San Francisco Bay" and "Organic Coffee Company"; TreeHouse sells under its own brand names such as "Caza Trail" Portion Packs.

62.     Branded Portion Packs are sold by Compatible Portion Pack manufacturers to retailers, wholesalers, and directly to consumers through online sales channels.

#### b.     Private Label Portion Packs Market

63.     The Private Label Portion Packs Market consists of Compatible Portion Packs that are manufactured by Compatible Portion Pack manufacturers and sold under retailer and wholesaler customers' brand names.   For example, the Kroger Company ("Kroger") has entered into a private label agreement with Keurig in which Keurig will manufacture Compatible Portion

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

Packs for Kroger and allow Kroger to sell those Portion Packs under Kroger's private label brands, "Kroger," "Private Select," and "Simple Truth."

64.     Generally, Private Label Portion Packs are significantly lower in price than Branded Portion Packs.  For example, Keurig's Branded Portion Packs are priced $0.51 per K-Cup at Costco, while Costco's Private Label Portion Packs are priced $0.38 per K-Cup.  On information and belief, certain consumers only consider Private Label Portion Packs when purchasing Compatible Portion Packs because of perceived significant price differences, while others choose only Branded Portion Packs because of perceived differences in quality.

65.     Moreover, on information and belief, retail customers also do not consider Branded and Private Label Portion Packs to be interchangeable or substitutable.  Retail and wholesale customers who purchase Private Label Portion Packs still purchase Branded Portion Packs as an additional option for resale to its customers.

### c.     The At-Home Market Segment

66.     The At-Home Market Segment is a multi-billion dollar market.  Keurig itself acknowledges that 20 million U.S. households have a K-Cup Brewer for use at home ███ ██

67.     Green Mountain controls approximately 95% of the At-Home Market Segment for Compatible Portion Packs.  Competing Portion Pack manufacturers hold the remaining 5% of this market segment.

68.     The At-Home Market is primarily comprised of three sales channels:  retailers, wholesalers, and the online retailers.

69.     The retail sales channel includes: (1) large chain grocery stores such as Safeway, Raley's, HEB, and Kroger that typically only sell Portion Packs and not K-Cup Brewers, and (2) large chain stores with appliance departments such as Bed Bath and Beyond, Best Buy, Target and Wal-Mart that typically sell both K-Cup Brewers and Portion Packs.

70.     The wholesale sales channel includes distributors such as Costco, BJ's Wholesale Club, and Sam's Club that sell K-Cup Brewers and Portion Packs, typically at large quantities

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

for discount prices to members who pay an annual membership fee.  These distributors purchase Portion Packs in bulk and thus can negotiate the specifications of the Compatible Portion Pack products it purchases from manufacturers.  For example, Costco has instructed Rogers regarding the number of Portion Packs it would like packaged in each box and has influenced the design of the packaging for Compatible Portion Packs sold in its stores.

71.     The online sales channel is a direct-to-consumer sales channel in which consumers can purchase Compatible Portion Packs directly from manufacturers.  On information and belief, online sales generate less than 10% of Compatible Portion Pack sales.  Industry reports have indicated that only 9% of Keurig's sales are generated through its direct-to-consumer e-commerce business and the other 91% of sales transactions are conducted through distributors and retailer partners.  On information and belief, a company forced to rely on online sales for the majority of its revenue would face significantly increased barriers to entry and be unlikely to achieve a minimum efficient scale to compete effectively in the marketplace.

### d.     The Away-From-Home Market Segment

72.     Compatible Portion Packs are also used outside of consumers' homes at, among other places, food service, workplace, higher education, and hospitality locations.

73.     On information and belief, the Away-From-Home ("AFH") Market Segment is served by distributors who enter into agreements with Compatible Portion Pack manufacturers and sell to business consumers. Keurig acknowledges that the AFH Market Segment accounts for 45% of the U.S. Compatible Portion Pack Market and is worth several billion dollars a year.

74.     Commercial K-Cup Brewers marketed to the AFH segment are different from those marketed for home use.  Commercial K-Cup Brewers require professional installation and maintenance and typically link directly into a water line.  Commercial K-Cup Brewers are also designed to withstand much higher usage than their At-Home counterparts.  Generally, only Commercial K-Cup Brewers are certified by Underwriters Labs (UL) for use in an office environment.

16

75.     Keurig distributes K-Cup Brewers and K-Cups to the Away-From-Home Market Segment through a nationwide network of more than 600 distributors that are classified by Keurig as: (1) "Keurig Authorized Re-Distributors" or "KARDs;" (2) "Keurig Authorized Distributors" or "KADs;" or (3) "Roaster Nominated Keurig Authorized Distributors" or "RNKADs."

76.     According to Keurig's agreements, a KARD "means a Person authorized by Keurig to purchase Keurig Packs from Licensed Partners of Keurig Products from Keurig for the exclusive purpose of selling Keurig Products only to KADs." KARDs purchase "K-Cups from Keurig in large quantities for the purpose of selling smaller quantities of K-Cups or Keurig Products to KADs and RNKADs and only to KADs and RNKADs."[1]

77.     A KAD "means a Person authorized by Keurig to purchase Keurig Products and Keurig Packs from Keurig, Licensed Partners or Keurig Authorized Re-Distributors and to sell, rent or lease such Keurig Products and Keurig Packs in a defined territory."

78.     An RNKAD is a distributor that was "nominated by a Licensed Roaster and subsequently authorized by Keurig to purchase Keurig Products from Keurig and nominating Licensed Roaster's K-Cups from only the Nominating Licensed Roaster's K-Cups to Office Coffee Market and Food Service Market customers in defined territories."

79.     All of Keurig's KADs, KARDs, and RNKADs (collectively, "KADs"), on information and belief, are required to sign multi-year agreements containing an exclusivity provision prohibiting these companies from distributing Competing Portion Packs. These exclusivity provisions have had the purpose and effect of substantially foreclosing Competing Portion Pack manufacturers' access to the Office Coffee Services Market, and more broadly the Away-From-Home Market Segment.

---

[1] Various Keurig agreements defining these terms have been submitted to the SEC and are publicly available online. *See, e.g.,* http://www.sec.gov/Archives/edgar/data/947661/ 000119312508208074/dex1037.htm.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

80.     Keurig maintains its monopoly power in the Away-From-Home Market Segment by leveraging its monopoly over the Single Serve Brewer Market in order to exclude competition from Competing Portion Packs.  Specifically, Keurig and its distributors agree to provide K-Cup Brewers to commercial or office customers at little or no cost, provided those customers agree to exclude Competing Portion Pack suppliers from this market segment by purchasing Compatible Portion Packs exclusively from Keurig.

**B.     Geographic Market**

81.     The relevant geographic market is the United States.  Single Serve Brewers, Portion Packs and Compatible Portion Packs are all sold throughout the United States.  Upon information and belief, Keurig distributes and sells its Single Serve Brewers and Compatible Portion Packs throughout the United States.  Rogers competes against Keurig in the Compatible Portion Packs Market throughout the United States.

**C.     Interstate Commerce**

82.     Defendant manufactures and sells Single Serve Brewers and Compatible Portion Packs in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

83.     Defendant's business activities substantially have affected and are affecting interstate commerce in the United States and have caused and continue to cause antitrust injury throughout the United States.

84.     Keurig had net sales of $4.358 billion for its 2013 fiscal year, which ended on September 28, 2013.  This number includes $3.187 billion in Portion Pack net sales and $827.6 million in Keurig Single Serve Brewer and accessories net sales.

85.     Keurig has a presence in states throughout the United States.  Keurig maintains a production and distribution facility in California; sales offices in Massachusetts; a production and distribution facility in Tennessee; its headquarters and production and distribution facilities in Vermont; a production and distribution facility in Virginia; and a production and distribution facility in Washington.

18

## KEURIG'S ANTICOMPETITIVE CONDUCT

86.    Keurig has improperly obtained and used its monopoly power to control the Single Serve Brewers Market and the Portion Packs Market, including the Compatible Portion Packs Market. It has done so by using exclusive dealing agreements to exclude competitors, reward its customers, and keep prices artificially high. In addition to its exclusive agreements, Keurig also has redesigned its brewers to block competition and made false and misleading statements about its competitors to create fear, uncertainty, and doubt in the marketplace.

### A.    Keurig Coerced Customers Into Entering Exclusive Agreements

#### 1.    Exclusive Agreements With Away-From-Home Market Distributors

87.    Keurig used anticompetitive agreements to cement market power in the AFH Market. On information and belief, Keurig provides K-Cup Brewers to its national network of KADs at a reduced price and KADs, in turn, offer the brewers for free or at a discount to its customers. In return, the KADs agree to exclusively sell only K-Cup brewers and Keurig-branded or Keurig-licensed Portion Packs to their customers. These restrictions are implemented through Keurig's requirement that KADs enter into multi-year KAD agreements, which include "loyalty" provisions that prohibit them from promoting, marketing, selling or otherwise making available any non-licensed Single Serve Brewers or Portion Packs. A copy of an exemplar KAD agreement is attached as Exhibit 3. The loyalty requirement provides:

> 3.2 Keurig Loyalty. Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs.

*Id*. Section 3.2 at 4.

19

88.     Through this tying provision, Keurig threatens to cut off distributors from these dominant and expensive brewers, as well as related parts and services. Distributors need access to such brewers, parts, and services to maintain their customers, and thus, their livelihood. Although Keurig and some KADs view their agreement primarily as "an equipment contract" for the sale of brewers, in actuality, KADs are forced to buy K-Cups exclusively in order to have continued access to Keurig's commercial brewers.

89.     Keurig further uses its leverage in the Single Serve Brewer Market to threaten KADs with an unlawful tie-in warranty that they or their customers will be financially responsible for any repairs to their brewers if Competing Portion Packs are used in those brewers. Specifically, KAD agreements provide that the warranty set forth in KAD agreements "shall not apply, and Keurig shall have no obligation under such warranty or otherwise, to Distributor or any third party with respect to applicable Keurig Products under the following circumstances," including, "[u]se of any cartridge, capsule, pod or other beverage base container, other than a Keurig Pack, in a Keurig Brewer . . . ." *Id.* Section 6.2 at 8.

90.     In addition to prohibiting distributors from selling Competing Portion Packs, these KAD agreements also affirmatively require distributors to purchase both Keurig-branded brewers  and Keurig-branded Portion Packs.  The form KAD agreement contains provisions governing "Keurig Pack Purchasing" and "Brewer Minimum Purchasing Requirements" that provide as follows:

> 3.3.  Keurig Pack Purchasing. ***Distributor shall order and purchase Keurig Packs directly from and only from GMCR, Licensed Partners or KARDs, unless otherwise agreed to in writing by GMCR.*** Nothing shall be construed within this Agreement, implied or not, to bind or require Licensed Partners or KARDs to sell Keurig Packs to Distributor.
>
> 3.4.  Brewer Minimum Purchase Requirements. Subject to the other terms of this Agreement, and ***in order to remain entitled to all of the benefits of this Agreement, Distributor shall purchase at least six (6) Model 83000 (or the GMCR designated equivalent, as set forth on Schedules 1.1 and 1.2 attached hereto) Keurig Brewers in each six month period following the***

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

> *date of this Agreement*, with measurement of such requirement to
> occur on the last day of each March and September following the
> date of this Agreement. The minimum purchase requirements for
> Distributor set forth in this Section are hereinafter referred to as
> the "Minimum Purchase Requirements". Notwithstanding the
> foregoing, there shall not be any Minimum Purchase
> Requirements for Distributor prior to either the first April 1 or
> October 1 on which Distributor is a KAD.

*Id*. Section 3.3 at 4 (emphases added).

91.     Thus, KADs must purchase K-Cup Brewers and K-Cups from Keurig, even if
they would prefer to purchase only K-Cup Brewers from Keurig and purchase Competing
Portion Packs from other sources or to purchase a combination of K-Cups and Competing
Portion Packs. Keurig leverages its monopoly power in the Single Serve Brewer Market to tie
these two distinct products together. A second unlawful tie occurs when KAD customers make
their purchases, in that customers that wish to purchase Portion Packs from the KADs are left
with no choice but to purchase K-Cups at Keurig's supracompetitive prices.

92.     Keurig monitors KADs' adherence to the loyalty provision and regularly threatens
to cancel the distributor agreement for non-compliance. For example, on March 26, 2012,
Keurig sent a letter to its KADs warning that "Any portion pack that you promote, market, sell,
or otherwise make available that is not made by a Licensed Roaster subjects you to termination
of your Keurig Agreement." A copy of this letter is attached as Exhibit 4.

93.     This letter claims that Keurig seeks to enforce the exclusivity provisions "because
we have not run these portion packs through our rigorous testing and approval process.
Therefore, we have no confidence that these non-licensed portion packs ensure the quality,
consistency and safety of our brewing systems for our mutual end use customers." *Id*. at 1.
However, on information and belief, this explanation is entirely pretextual. Competing Portion
Packs were introduced into the market over a year and a half before this letter was sent and they
had not created any quality or safety issues for consumers or K-Cup Brewers. To the extent
Keurig had legitimate concerns with any potential threat to "the quality, consistency and safety"
of K-Cup Brewers posed by Competing Portion Packs, Keurig could and should have actually

submitted the Competing Portion Packs to testing. On information and belief, Keurig's attempts to enforce the exclusivity provisions are motivated solely by its desire to restrain competition and maintain its market share. Additional evidence that Keurig's safety concerns are pretextual is discussed throughout, at, for example ¶¶ 181, 222-227.

94.     Thus, not only does Keurig use these tying and exclusivity provisions to coerce distributors to forego purchases of Competing Portion Packs, but it further uses these provisions to coerce distributors to disparage Competing Portion Packs in the marketplace to their customers.

95.     On information and belief, these threats and loyalty provisions have effectively blocked out nearly all competition from Competing Portion Pack manufacturers in the AFH Market. Despite offering a sought-after product, Rogers has almost no business in the AFH Market and has been told on numerous occasions that KADs will not carry Rogers' products out of fear of Keurig's retribution.

96.     Moreover, it is clear that Keurig leverages its monopoly power to force the distributors to enter into these exclusionary KAD Agreements and that if given a choice, KADs would prefer not to enter into exclusive agreements with Keurig. Market research indicates that distributors feel generally unhappy with, and restricted by, the terms of Keurig's multi-year KAD Agreements. Distributors have described their relationship with Keurig as contentious and expressed dissatisfaction with Keurig's arrogance.

97.     Keurig has made it nearly impossible to compete on the same scale as Keurig with comparable efficiencies of scale because Keurig has locked up nearly all of the large distributors, including KARDs, that have a national network of warehouses and distribution centers that can be used to reach smaller KADs with the ability to operate with smaller trucks or vans and without as much national warehousing infrastructure. Keurig's exclusive agreements locking up large distributors make it impossible for competitors such as Rogers to achieve a minimum efficient scale or to competitively constrain Keurig in the Portion Pack Market.

98.     On information and belief, Keurig has anticompetitive exclusive agreements with the following large, national KARDs that prohibit them from selling Competitive Portion Packs: Office Depot, Staples, Vistar, United Stationers, WB Mason, BC Coffee & Supplies, Inc. SP Richards Co., Vend Catering Supply, Nestle Waters, Direct Coffee Service, Aramark, Sodexo, Compass, and Canteen.   Keurig's exclusive agreements with these companies alone foreclose Competing Portion Pack manufacturers' access to approximately 80% of Compatible Portion Pack Market sales to Away-From-Home customers, on information and belief, and restrain Competing Portion Pack manufacturers' ability to compete on a level playing field with Keurig.

99.     Rogers and other Competing Portion Pack manufacturers cannot simply find other distributors competing for these accounts and hire them instead to distribute Competing Portion Packs.   Because Keurig dictates particular territories in which each KAD operates, there is limited competition between distributors, and sales are driven primarily by long-standing relationships between the KADs and their end customers.   KADs in different territories are restricted from competing with one another because selling outside of the territory assigned by Keurig would constitute a breach of the KAD agreement.   Thus, even if Keurig terminates and replaces a KAD in a particular territory, the former KAD would not have the information or access to other customers that would enable the former KAD to compete for new accounts.

100.    Moreover, Rogers and other Competing Portion Pack manufacturers are restrained from enticing current, and even former, terminated KADs to switch from distributing K-Cups to distributing Competing Portion Packs because Keurig's restriction on selling Competing Portion Packs survives termination of the KAD agreement.   Specifically, Keurig's "Terminated Distributor Terms" provide that "[d]istributor shall only sell or use K-Cups or Keurig Products supplied by Keurig or K-Cups supplied by Licensed Roasters." *See* Exhibit 3, Section 2 at 19.

101.    Accordingly, the estimated foreclosure percentages provided above should likely be even higher because these estimates only take current KADs into consideration and do not account for the those distributors that have been terminated by Keurig, but are still prohibited from selling Competing Portion Packs under their "Terminated Distributor Terms."

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

102.    Even if Competing Portion Pack manufacturers purchased their own trucks and hired their own employees in an attempt to enter the Office Coffee Services Market, they would not have access to the office managers who make purchasing decisions in close coordination with the KAD who owns the customer account.  Moreover, entering into the AFH distributor business would be inefficient for a Competing Portion Pack maker because AFH distributors do not simply deliver Compatible Portion Packs, but rather provide a range of products and services.

103.    For example, distributors keep track of break room inventories across multiple products; unload and stock products; install, clean, and repair break room equipment, product displays, and accessory products such as free-standing cabinets that support a brewer and hold a week's supply of used K-Cups; and bill and provide receipts to office managers across bundles of products, rather than forcing them to keep track of numerous small receipts for many products.

104.    Accordingly, purchasing Competing Portion Packs through Amazon or a retail store generally is not a viable, cost effective, or efficient option for office managers.  Distributors can achieve greater efficiencies and economies of scale by packing multiple products together that an office customer will keep stocked in its coffee or break room, including Compatible Portion Packs, water, water filters, soda, creamers, sweeteners, cups, paper products, snacks, condiments, and cleaning supplies, among others.  Office managers would greatly increase their transaction costs, expenses, and time devoted to inventorying and stocking the break rooms themselves if they were forced to purchase their products individually through Amazon or retail stores.

105.    On information and belief, █████████████████████████
████████████████████████████████████████████████████
██████████████████████████     ███████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

106.     These anticompetitive contract provisions cannot be justified as a reasonable restraint on competition on the basis that they protect the value of any legitimate investment by Keurig or deter free-riding on any expertise and services provided by suppliers and distributors, many of which were performing the same services before Keurig was even formed.  Keurig did not create these distribution services, buy their trucks, hire their personnel, or even build their relationships with end customers.  For example, the companies that distribute Keurig's brewers were generally already distributing coffee and break room supplies to end customers and already had their relationships with those customers.  Keurig simply induced these distributors to enter into restrictive agreements before Competing Portion Packs existed in order to prevent market entry once Keurig's patents expired.  However, now that the patents have expired and numerous distributors would prefer to purchase Competing Portion Packs instead of or in addition to K-Cups, Keurig coerces these companies to submit to these anticompetitive provisions by threatening to take away their access to Keurig brewers, and in turn, the end customers with whom the distributors had cultivated relationships.

## 2.     Exclusive Agreements With At-Home Distributors

107.     To maintain its monopoly in the At-Home Market, Keurig uses a similar technique.  It enters into exclusive agreements with retailers for both Keurig-branded and private label Portion Pack products.  Pursuant to the exclusive agreements in the At-Home Market, distributors and retailers are prohibited from marketing or selling any Competing Portion Packs.  A substantial and increasing amount of commerce in the At-Home Market is foreclosed by these exclusive agreements.

108.     Multiple potential Rogers customers have informed Rogers of the exclusive provisions in their agreements with Keurig and stated that Keurig has threatened to terminate their access to K-Cup Branded Portion Packs if the potential customer purchases any Competing Portion Packs.  For example, Staples, several Costco franchises, and Office Max have informed Rogers that they cannot carry Rogers' OneCup due to exclusivity contracts with Keurig.  On information and belief, Keurig has established similar exclusivity agreements with other At-

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

Home distributors and will continue to establish additional exclusive agreements with retailers, particularly as the roll-out of Keurig 2.0 continues and Keurig is able to leverage its lock out feature (discussed below at, for example ¶¶ 176-232).

109.   Keurig has also entered into exclusive agreements with ███████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████ agreements contain similar terms.

110.   As another example, Meijer, a retailer that sells both Compatible Portion Packs and Keurig Brewers, recently switched its private label program from another unlicensed Competing Portion Pack maker to Keurig and additionally stopped stocking other unlicensed brands that were not part of Meijer's private label program.

111.   As a further example, on information and belief, Keurig threatens retailers that it will not provide its brewers for important holiday sales such as Black Friday, and will limit promotions and incentive for retailers unless retailers agree not to sell Competing Portion Packs.

### 3.   Exclusive Agreements With Roasters

112.   Keurig has also entered into a series of anticompetitive agreements with would-be competing coffee roasters and brewer manufacturers. ███████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████

███   ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

26

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT



*Id.,*Section 13.1 at 38.

115.    On March 14, 2014, Keurig and Starbucks announced the amendment of their existing five-year agreement, with Starbucks giving up its right to be the exclusive super-premium Keurig licensed brand in exchange for improved business terms.

27

116.    On information and belief, Keurig entered into a similar contract with ███



117.    Keurig's agreements with roasters and brands also prohibit such competitors from developing or supporting new Single Serve Brewers in the K-Cup format that would otherwise open up competition in the Single Serve Brewer Market and with Competing Portion Pack manufacturers.

118.    As Keurig itself is a roaster that owns its own brand names, Keurig would be a direct, horizontal competitor of other roasters and brands, but for its "non-competition" agreements with those companies.  Keurig and its licensees also compete for Compatible Portion Pack sales with unlicensed competitors, such as Rogers.  As set forth in the Form 10-K of The

28

J.M. Smucker Company ("Smucker") submitted to the U.S. Securities and Exchange Commission:

> Through a manufacturing and distribution agreement with Keurig, [Smucker] compete[s] in the single serve coffee market with the *Folgers*, *Folgers Gourmet Selections*, and *Millstone* premium coffees *K-Cup* products. Additionally, we plan to launch *Café Bustelo K-Cup* packs in July 2014. **K-Cup competitors include Green Mountain, Starbucks, Eight O'Clock, Maxwell House, and *Gevalia*, <u>*as well as many private label brands*</u>.**

Smucker's Form 10-K (Apr. 30, 2014), at 5 (emphasis added).

119. Many private label brands have been produced by unlicensed Competing Portion Pack manufacturers, such as TreeHouse and Rogers.

120. Upon information and belief, many, if not all, of these agreements between Keurig and its licensees have multi-year terms and include a "K-Cup Exclusivity" provision, which prevents licensed roasters and brands from also entering into any agreements with Keurig's competitors, such as Rogers, relating to the production of Compatible Portion Packs.

121. Specifically, licensed roasters and brands agree:



REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

■■■■■■■■■■■■■■■■

122.    Some restrictions demanded by Keurig are even broader, prohibiting competition in the coffee business as a whole.  For example, the 2013 "Noncompetition Agreement Between Green Mountain Coffee Roasters, Inc. and Global Baristas, LLC" provides that Tully's "will not, and will cause its respective subsidiaries and Affiliates not to, directly or indirectly, operate in the Coffee Business in [the] United States of America, Canada, Mexico and the Islands of the Caribbean" for five years.  *See* Exhibit 7, Section 3 at 1 (attaching Noncompetition Agreement Between Green Mountain Coffee Roasters, Inc. and Global Baristas, LLC, dated Jan. 25, 2013). Although Global Baristas concurrently entered into a supply and license agreement for Keurig to supply K-Cups using the Tully's brand, the broad prohibition on competition is not reasonably necessary or tailored to achieve any procompetitive effects associated with that arrangement.

123.    In this way, Keurig has eliminated competition with the largest roasters and brands that would otherwise have the most financial incentives to enter into the Single Serve Brewer Market and to work with Competing Portion Pack manufacturers to increase output or decrease prices.  By demanding that companies who contract with Keurig for the supply of K-Cups accept provisions prohibiting those companies from making or selling K-Cup Brewers, Keurig is leveraging its monopoly in the Compatible Portion Pack Market to unlawfully maintain its monopoly in the Single Serve Brewer Market.  The restraint on competition in the Single Serve Brewer Market, in turn, further restrains competition in the Compatible Portion Pack Market by eliminating new brewers that could otherwise increase demand for Competing Portion Packs.  Thus, the restraint on K-Cup Brewer sales serves to further reduce output and maintain supracompetitive K-Cup prices.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

124.    These anticompetitive restrictions are not reasonably necessary or tailored to achieve any procompetitive benefit.  Rather, they are naked restraints on competition agreed to by companies that would be direct horizontal competitors but for their agreement not to compete.

125.    Moreover, as these agreements are made across some, if not all, of the largest beverage brands in the world, these agreements substantially foreclose and unreasonably restrain an enormous amount of competition.  And, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

126.    On information and belief, Keurig has entered into similar anticompetitive agreements with nearly all other potential Competing Portion Pack manufacturers and roasters.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

127.    Keurig's exclusionary agreements with its horizontal competitor coffee brands and other beverage companies also unreasonably restrain trade because they ████████████

████████████████████████████████████████

██████████████████████████  This creates a further incentive for licensed brands to conspire to exclude Competing Portion Pack manufacturers from the market unless those competitors agree to take a license or become "authorized" by Keurig, thereby likewise subjecting the Competing Portion Pack manufacturers to Keurig's territorial control and allocation.

128.    On information and belief, the restrictions placed ██████████████████

████████████████████████████████████████████████

31

█████████████████████████████████████████████
████████████████

129.   In December 2006, Keurig entered into a multi-year agreement with Caribou under which Caribou-branded coffee would be packaged and sold in K-Cups.  The parties renewed and amended their agreement in December 2011.  Under this five-year agreement, with two automatic renewals extending the term ten years until 2016, Caribou agreed to sell Keurig its coffee for Keurig's packaging into K-Cups and granted Keurig a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups.  The contract provides that Caribou may only sell the K-Cups at Caribou coffee stores and Caribou's website for "At Home" use only.  *See* Exhibit 1.   Keurig's agreement with Caribou also contains a "Portion Pack Exclusivity" provision prohibiting Caribou from "sell[ing] coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System."  *Id*.  The Caribou agreement also prohibits Caribou from "licens[ing] any trademarks for use by third parties" in connection with products "intended for use with the Keurig Brewing System."  *Id*.  The agreement also contains a "No Participation in Competing Systems" provision prohibiting Caribou from making or supporting Competitive Brewers, such as "Flavia, Kenco and Braun (the Tassimo system)."  *See* Exhibit 1, Section 5 at 7.

████ █████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

███████████████████████████████████████████████

████████████████████████████████

████  █████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████  ███████████████████

████████        According to Dunkin' Brands Group, Inc.'s July 2013 8-K filing, under the new

agreement, which will be in effect through February 2016, "[Keurig] exclusively packages

Dunkin' K-Cup packs."  Dunkin' Brands Group's 8-K (July 25, 2013) at 4.

████  ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

33

███████████████████████████████████

████████

133.    In May 2013, Keurig entered into a multi-year agreement with The Coffee Bean & Tea Leaf, one of the largest privately held specialty coffee and tea retailer in the United States, under which Coffee Bean K-Cups will be sold in a variety of channels beginning in the spring of 2014.

134.    In July 2013, Keurig entered into a multi-year agreement with Cinnabon under which Keurig will manufacture Cinnabon K-Cups.  Under the terms of this agreement, Cinnabon K-Cups will be sold in the retail and Away-From-Home Market Segment, as well as in Cinnabon restaurants.

135.    In February 2014, Keurig and Krispy Kreme announced a multi-year agreement under which Krispy Kreme K-Cups will be available in the grocery, retail, and Away-From-Home channels, as well as in Krispy Kreme shops.

136.    Later that month, Keurig and Luigi Lavazza S.p.A. announced a multi-year agreement to make Lavazza brand coffee available in K-Cups, to be sold at specialty, grocery, and Away-From-Home retailers.

137.    On the same day that Keurig announced the amended Starbucks deal, Keurig and Northern California-based Peet's Coffee & Tea announced that they had reached a multiyear manufacturing and distribution agreement for Peet's specialty coffee and tea K-Cups.  ████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████

138.    On or about March 2013, Unilever signed an agreement with Keurig to make Unilever's Lipton Tea products.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

139.    In June 2014, Keurig announced a new partnership with BJ's Wholesale Club, under which Keurig would manufacture BJ's Wellsley Farm branded K-Cups, which are now sold exclusively at BJ's 202 East Coast stores and its website.

140.    In July 2014, Keurig announced a new partnership with Harris Teeter, a North Carolina-based grocery store with locations in Midwestern and Southern states under which Keurig is the exclusive manufacturer of Harris Teeter branded K-Cups.

141.    In August 2014, Keurig and Kraft Foods Group entered into a high-profile licensing, manufacturing, and distribution agreement to make Kraft's beverage brands, including Maxwell House, Gevalia, Yuban, and McCafé (available at McDonald's) available in the K-Cup and K-Carafe formats.  After a transition period during which both Kraft and Keurig will both manufacture K-Cups, Keurig will eventually become the exclusive U.S. manufacturer of Kraft-branded K-Cups.

142.    Keurig has also entered into similar agreements with Newman's Own Organics Coffee, Gloria Jean's Coffee, and Wolfgang Puck, as well as agreements to manufacture and distribute non-coffee products with companies such as Bigelow, Twinings, Swiss Miss, Snapple, Celestial Seasonings, Campbell's, and most recently, Coca-Cola.

143.    Keurig expanded its partnership with the Coca-Cola Company in September 2014.  After signing a ten-year deal with Keurig in February 2014, the companies announced a new deal to make Coca-Cola's Honest Tea branded beverages available in K-Cups.   On information and belief, Coca-Cola is also prohibited from dealing with Competing Portion Pack manufacturers under a contract that forecloses Competing Portion Pack manufacturers' access to Coca-Cola distributors.

144.    With these licensing agreements, Keurig now owns or licenses the vast majority of nationally distributed coffee brands.

145.    Competing Portion Pack manufacturers like Rogers are harmed by these non-competition agreements because they: (1) prohibit Keurig's competitors from selling coffee or beverage inputs to Rogers; (2) prohibit Keurig's competitors from entering into licensing

35

arrangements with Rogers; (3) prohibit Keurig's competitors from using Rogers to co-pack or manufacture Competing Portion Packs for their brands; and (4) restrain entry into the Single Serve Brewer Market that would otherwise provide new brewers that would work with Competing Portion Packs, without having to incur the additional costs required to make special lids that work in 2.0 Brewers. Each one of these agreements is an unlawful restraint of trade in and of itself, but together they severely restrict competition, thereby harming Competing Portion Pack manufacturers and the Compatible Portion Pack, Portion Pack, and Single Serve Brewer Markets.

146.    Keurig's agreements with beverage brands also contain restrictions dictating where and how the licensed K-Cups can be sold, thereby allowing Keurig to maintain supracompetitive prices across licensed brands by controlling output. This creates a further incentive for licensed beverage brands to renew their agreements with Keurig and to refuse to deal with any Compatible Portion Pack maker that refuses to take a license or become "authorized" by Keurig.

147.    Upon information and belief, Keurig has entered into this web of anticompetitive and unduly restrictive exclusionary agreements with coffee roasters and/or coffee and other beverage brands as part of its expansive campaign to maintain its monopoly position in the Compatible Portion Pack Market by excluding competitors who refuse to allow Keurig to dictate the pricing, geographical territory, market segments, and/or channels of distribution in which Compatible Portion Packs may be sold. By joining together, Keurig and its competitor roasters and brands can limit competition from lower-priced Competing Portion Packs by agreeing not to produce or support competitive Single Serve Brewers and not to do business with Competing Portion Pack manufacturers unless they also become licensed and cede control of their pricing and output to Keurig in order to elevate prices.

148.    On information and belief, this expansive system of exclusionary and non-competition agreements is orchestrated by Keurig, and coffee and other beverage brands that

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

enter into a license or manufacturing agreement with Keurig do so with the express knowledge of Keurig's anticompetitive agreements with other competitor roasters and brands.

149.    Keurig's agreements further demonstrate that the competitor roasters and brands use Keurig as a conduit for securing agreements from other competitors in order to ensure that prices can be maintained at supracompetitive levels.   For example, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

150.    In addition to restraining competition between roasters, brands, Keurig, and Competing Portion Pack manufacturers in the upstream markets for the purchase of inputs and the manufacture of Compatible Portion Packs, Keurig's agreements with roasters and brands also restrain competition in the downstream markets for the sale and distribution of Compatible Portion Packs.   Keurig's agreements with roasters and brands give Keurig access to those companies' pre-existing distribution networks and convert them into KADs that are prohibited from doing business with Competing Portion Pack manufacturers.   For example, a company providing distribution for a roaster that enters into a non-competition agreement with Keurig becomes a "Roaster Nominated Keurig Authorized Distributor" or "RNKAD," which is defined by Keurig as:

> A company that was nominated by a Licensed Roaster and has an effective distribution agreement with Keurig that specifies a geographical territory and channels of distribution.   These companies purchase Keurig Products from Keurig and exclusively the nominating Licensed Roaster's K-Cups from the nominating Licensed Roaster, KARDs, or Keurig for resale.

License and Distribution Agreement between Keurig, Inc. and Diedrich Coffee, Inc. (Jul. 29, 2003), at 5, http://www.sec.gov/Archives/edgar/data/947661/000119312508208074/ dex1037.htm. Thus, Keurig's anticompetitive agreements with roasters and brands substantially

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

foreclose access not only to those roasters and brands, but also to the distributors that provide services for those roasters and brands.

151.    Just as co-conspirator roasters and brands enter into non-competition agreements with Keurig with knowledge as to other agreements and terms at the roaster and brand level, Keurig's roaster and brand competitors also enter into their agreements with express knowledge of Keurig's exclusionary distribution agreements.  This is demonstrated, for example, by the Amended and Restated Purchase and License Agreement entered into between Keurig and Caribou Coffee Company, Inc. ("Caribou"), on December 20, 2011. *See* Exhibit 1. The Caribou agreement expressly recites the fact that "Keurig Authorized Distributors" and "Keurig Authorized Re-Distributors" enter into "distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase … of [both bulk and non-bulk] quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale." *Id.* Section 1.11 at 2.

152.    As agreed to between Keurig and roasters and brands, such as ████████████ Caribou, KAD Agreements contain a corresponding restriction prohibiting distributors from selling K-Cups outside of the "Authorized Location" determined by Keurig.  ████████████ ███████████████████████████████████Exhibit 1, Section 1.1 at 1.

153.    This massive hub-and-spoke conspiracy has the anticompetitive effect of allowing Keurig to allocate markets, restrain output, restrain price competition, and to exclude competitors from every level of the supply and distribution chain.  Indeed, the coffee and beverage brands' agreements not to deal with Competing Portion Pack manufacturers that could otherwise increase their product output and sales revenue and provide a back up or second manufacturer or the like do not make economic sense, but for a conspiracy to sustain supracompetitive K-Cup prices by restraining price competition with Competing Portion Pack manufacturers.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

154.   Indeed, these companies are taking on a material risk by having Keurig serve as their sole suppliers for Compatible Portion Packs.  As set forth by Smucker in its 2014 10-K filed with the Securities and Exchange Commission:

> Keurig is our single-source supplier for K-Cup packs which are used in its proprietary Keurig K-Cup brewing system.  There are a limited number of manufacturers other than Keurig that are making cups that will work in such proprietary brewing system[s]. **If Keurig is unable to supply K-Cup packs to us for any reason, it could be difficult to find an alternative supplier for such goods on commercially reasonable terms, which could have a material adverse effect on our results of operations**.

Smucker's Form 10-K (Apr. 30, 2014), at 7 (emphasis added).

**B.     Keurig Aggressively Acquired Its Competitors**

155.   Prior to 2006, Keurig, Inc. manufactured brewing equipment and GMCR sold coffee, including Compatible Portion Packs.  GMCR began acquiring progressively larger shares of Keurig, Inc. starting in 1996, and the two companies merged in 2006.  At the time of the merger, Keurig, Inc. had in place license agreements with various coffee company competitors, including GMCR, to manufacture and sell its proprietary K-Cups.

156.   After acquiring Keurig, Inc. in or around June 2006, GMCR aggressively eliminated potential competitors through successive acquisitions of entities to whom Keurig, Incorporated had previously provided a license.  By eliminating licensees through purchase, Keurig could ensure that it did not face competition after the expiration of its K-Cup patents.

157.   Keurig acquired Tully's Coffee Corporation on March 27, 2009.  It acquired Timothy's Coffees of the World, Inc. on November 13, 2009.  This was followed by the acquisition of Diedrich Coffee, Inc. in May of 2010.  In September 2010, Keurig acquired LJVH Holdings, Inc. which offered Bigelow tea, and Van Houtte and Wolfgang Puck coffee brands.  Keurig completed each of these acquisitions with the goal and purpose of maintaining its monopoly in the Compatible Portion Packs Market by eliminating the threat of competition from

39

competitors, thereby suppressing competition and allowing Keurig to charge supracompetitive prices.

**C.    Keurig Vigorously Pursued Objectively Baseless Patent Claims Against Its Competitors**

158.    Prior to October 2010, Keurig – through its own branded products and through its licensees – was the only supplier of Compatible Portion Packs.  As a result, Keurig effectively controlled 100% of Compatible Portion Pack sales.  In October 2010, Sturm entered the market as the first to manufacture Competing Portion Packs and was promptly sued by Keurig for patent infringement.  Similarly, in November 2011, only weeks after Rogers began selling Competing Portion Packs, Keurig promptly sued Rogers for patent infringement.

159.    Keurig's "scorched earth" litigation strategy for eliminating competition by initiating and vigorously litigating objectively baseless patent infringement lawsuits against both Sturm and Rogers was recognized by multiple courts as meritless and improper.  The respective Federal District Courts and the Court of Appeals for the Federal Circuit criticized Keurig for "attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig brewers" and for making an "end-run" around the proper use of the patent laws. *Keurig, Inc. v. Sturm Foods, Inc.,* 732 F.3d 1370, 1374 (Fed. Cir. 2013); *Keurig, Inc. v. JBR, Inc.,* No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 73845, at *35 (D. Mass. May 24, 2013).

160.    Keurig's suit against Sturm in the United States District Court for the District of Delaware ("District of Delaware") alleged without basis that Sturm's Competing Portion Packs infringed certain of Keurig's utility patents.  The asserted patents, however, covered intellectual property related to Single Serve Brewers and methods of using the brewers.  Keurig went so far as to allege that consumers of its own Single Serve Brewer product were infringing these Single Serve Brewer patents by using Sturm's Competing Portion Packs, and that Sturm was thus also liable for "inducing" infringement by these consumers.

40

161.    Keurig also asserted baseless trademark infringement and false advertising claims against Sturm based upon a statement on the packaging of Sturm's Competing Portion Packs that the product was "[f]or use by owners of Keurig coffee manufacturers."

162.    Keurig employed the same strategy against Rogers in its lawsuit filed in the United States District Court for the District of Massachusetts ("District of Massachusetts"). Keurig alleged that the sale of Rogers' Competing Portion Packs to consumers infringed and induced infringement of the same Single Serve Brewer utility patents that Keurig asserted against Sturm.  In addition, Keurig also asserted claims for infringement of a design patent that was not embodied by any Keurig products on the market against Rogers.

163.    In September 2012, the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims.  Keurig promptly appealed the decision to the United States Court of Appeals for the Federal Circuit ("Federal Circuit").

164.    Rogers offered to stay its case pending Keurig's appeal of the District of Delaware's September 13, 2012 decision granting summary judgment due to patent exhaustion. Keurig refused, and instead accelerated the pace and expense of the litigation.

165.    Keurig took Rule 30(b)(6) depositions (Noticed on November 30, 2012) over the course of two days on January 10 and 11, 2013, of Rogers' Chief Operations Officer and Director Pete Rogers and Chief Financial Officer Michael Sarina.

166.    In March and April 2013, Keurig took eleven more depositions including virtually all of Rogers' senior management.

167.    Continuing with its strategy of vexatious litigation, Keurig filed a meritless Motion to Compel JBR to Supplement its Production, to Produce Witnesses, and for Sanctions. The motion included a demand for documents clearly covered by the work product and attorney client privilege.

168.    In May 2013, the District of Massachusetts granted Rogers' Motion for Summary Judgment and entered judgment for Rogers upon determining that Rogers' designs were "sufficiently distinct."   The Court chastised Keurig for "attempting to institute a postsale

41

restriction that prevents non-Keurig cartridges from being used in Keurig brewers.  Supreme Court precedent prevents plaintiffs from undertaking such an end run." *Keurig v JBR*, 2013 U.S. Dist. LEXIS 73845, at *35.

169.    Keurig appealed the District of Massachusetts' decision to the Federal Circuit, including the patent exhaustion decision that was already pending before the Federal Circuit in the *Sturm* case.

170.    On October 17, 2013, the Federal Circuit affirmed the District of Delaware's ruling in the *Sturm* case and criticized Keurig for attempting to make an "end-run" around the proper use of the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig v. Sturm Foods*, 732 F.3d at 1374.

171.    Although Keurig agreed not to pursue further its appeal related to the utility patents in light of the Federal Circuit's decision in *Sturm*, it continued to pursue its appeal of the District of Massachusetts' decision regarding the design patent.  On March 12, 2014, only six days after the Federal Circuit heard arguments on Keurig's appeal, the Federal Circuit entered judgment affirming the District of Massachusetts' grant of summary judgment in Rogers' favor and stated that none of the relief sought in Keurig's appeal would be granted.

172.    Keurig's vexatious litigation strategy was successful in maintaining its competitive advantage.  Both Rogers and Sturm were forced to spend money and time defending the lawsuits.  Moreover, the lawsuits were used by Keurig to sow doubt and confusion amongst consumers about the viability of Competing Portion Packs.  On information and belief, Keurig used the existence of the lawsuit in order to convince distributors and third parties to stop doing business with Rogers and Sturm.

173.    The lawsuit created confusion in the market as Keurig assured consumers that it would win and would secure an injunction to prohibit the supply of Competing Portion Packs. Rogers devoted significant resources to the defense against these baseless claims, including approximately $2 million in legal costs and fees.  On information and belief, Rogers lost many potential and actual customers due to the lawsuit.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

174.    On information and belief, Keurig initiated the suits against Sturm and Rogers knowing that it could not prove infringement due to patent exhaustion.  On information and belief, rather than attempting to prove infringement, the real reason that Keurig initiated these suits was to harm Rogers' and Sturm's ability to compete with Keurig's Compatible Portion Packs business by causing Rogers and Sturm to divert resources from marketing their respective Compatible Portion Packs businesses to defend against Keurig's claims and to incur substantial legal fees associated with their defenses, thereby increasing of the costs Rogers' and Sturm's Compatible Portion Pack products.  On information and belief, Keurig initiated these suits to harm Rogers' and Sturm Foods' ability to compete with Keurig's Compatible Portion Packs business also by creating confusion and doubt among Rogers' and Sturm's potential and existing customers about the commercial viability of Rogers' and Sturm's Compatible Portion Pack products, and by delaying Rogers' and Sturm's ability to grow their respective Compatible Portion Pack businesses.  Keurig's reasons for initiating these suits are evidenced by its vexatious litigation tactics and continued prosecution of meritless patent infringement claims.

175.    On information and belief, this conduct harmed consumers of Compatible Portion Packs by allowing Keurig to charge supracompetitive prices and by delaying the growth of superior Competing Portion Packs that compete with Keurig's Compatible Portion Packs.

**D.    Keurig 2.0 Is A Predatory Technology That Further Ties Keurig K-Cups to Brewers And Locks Competitors Out of The Market**

**1.    Developing The Authentication Mechanism**

176.    In 2012, Keurig increasingly became concerned about the threat Competing Portion Packs posed to Keurig's sales and prices in the Compatible Portion Pack Market. ███

███████████████████████████████████████████████████

██████████████████

177.    In particular, in or around July, 2012, ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

43



*Id.* at 2.

Keurig knew implementation of the authentication mechanism would violate various antitrust laws. Keurig therefore devised a legal strategy to shield itself from liability.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

182.    These developments were largely driven by Keurig's fear of increased competition.    In September 2012, Keurig lost patent protection and a number of other Compatible Portion Packs were introduced to the market.    On information and belief, Kroger, Peet's Coffee and Tea ("Peet's"), and Target (Archer Farms) partnered with Competing Portion Pack manufacturers to introduce new brands and private label Portion Packsshortly after Keurig's patents expired.    Similarly, Kraft Foods Group Inc. ("Kraft") announced the introduction of Maxwell House and Gevalia Competing Portion Packs in October 2012.

183.    Keurig began working with third-party consultants to further develop a lock out mechanism to hinder competition from Competing Portion Pack manufacturers. ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████    ██████████████████████

████████████████████████████████████████████████

██████████████████████████████

184.    On information and belief, ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

██████    ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

45

186. After discussing █████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████

187. In or around September, 2012, ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████
██ ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████
██ ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████
██ ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

46



### 2. Keurig Implemented Its Lockout Plan by Introducing the Taggant Technology in Its 2.0 Brewer and Creating a Pre-Launch Marketing Campaign That Cut Off Competitors from the Market Through Customers' Fear, Uncertainty and Doubt

192.     In November 2013, Keurig announced the Keurig 2.0 Brewer.  Analysts have widely recognized that Keurig's strategy with the 2.0 Brewer is to re-close the Keurig system, making Keurig 2.0, the next generation brewer, incompatible with unlicensed brands.  As articulated by Keurig's CEO Brian Kelley, the Keurig 2.0's Brewing Technology must read the lid and recognize the Keurig pack that has been inserted, meaning that the system will not brew unlicensed packs.

193.     On information and belief, 2.0 Brewers cost more to produce and are more subsidized than the Keurig 1.0 Brewer.  Keurig CEO Brian Kelly explained that 2014 balance sheets and inventory would include a normal new product cost cycle and that Keurig expected to experience some gross margin and inventory headwinds in the short-term.

194.     On information and belief, these public statements ███████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

47

195.   On information and belief, ████████████████████

███████████████████████████████████████████

████████████████████████

196.   On information and belief, ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

197.   On information and belief, Keurig also faced added costs, because the Keurig 2.0 Brewer did not brew many Keurig-licensed Portion Packs produced prior to late 2013.  ████████

███████████████████████████████████████████

████████████████████████████

198.   On information and belief, ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

199.   At least twice in the past four years, Keurig has raised K-Cup prices approximately 12%.  While Keurig claimed such price increases were caused by rising input costs, industry sources state that commodity prices are insignificant to K-Cup pricing.  Only a small amount of coffee is in each cup, and Portion Pack manufacturers believe that the price of the coffee is an insignificant factor in the cost of our production.  Thus, single-cup products are shielded from even a sudden upturn in raw coffee pricing.  Similarly, Portion Pack manufacturers believe commodity costs are irrelevant on the single-cup buyer side, since Portion Packs are not a product type that goes up when coffee costs rise and down when they fall.

200.   On information and belief, Keurig's lock out technology is part of Keurig's strategy to monopolize the entire Compatible Portion Pack Market.  Keurig has stated that for

2014, its strategy is to convert Competing Portion Pack manufacturers to licensees by leveraging the 2.0 Brewer lock out.   CEO Brian Kelley emphasized this point repeatedly in discussions with investors, suggesting that the Competing Portion Pack share would decline in the second half of 2014.   And despite raising prices 9% unilaterally, Keurig has bragged that its licensed market share has grown and that the majority of Competing Portion Pack manufacturers that existed prior to the announcement of the 2.0 Brewer have now taken a license.

201.   As Keurig explained during its November 19, 2014 earnings call:

> We have now signed the large majority of previously unlicensed portion pack volume to our system and we're in the process of transitioning these brands.
>
> Since last quarter, we announced new relationships with Kraft, Meijer, W.B. Mason and SUPERVALU, and began shipping Keurig-manufactured store brands to several new customers, including Walmart and Sam's Club.
>
> As we said previously, we have also signed brands that we have not yet publicly announced.   In the IRI data for the four-week period ending November 2nd, you've begun to see the share shift toward the Keurig-licensed packs.

*KeurigGreenMoutain's (GMCR) CEO Brian Kelley on Q4 2014 Results – Earning Call Transcript,* Seeking Alpha (Nov. 20 2014), http://seekingalpha.com/article/2697145-keurig-green-mountains-gmcr-ceo-brian-kelley-on-q4-2014-results-earnings-call-transcript?all=true&find=keurig.

202.   On information and belief, Keurig has disseminated these messages to the public at large and to a substantial number of retailers responsible for selling hundreds of millions of dollars' worth of Compatible Portion Packs on an annual basis, with the purpose and effect of depriving Rogers and other Competing Portion Pack manufacturers of significant sales to both retailers and consumers and causing harm to their goodwill so that Competing Portion Pack manufacturers are less able to compete for future sales in the Compatible Portion Pack Market.

203.   As of October, 2014, market analysts estimated that Keurig had recaptured two thirds of the market share it had lost since the introduction of Competing Portion Packs, bringing

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

its total market share of Competing Portion Packs to 95%.  Much of this has come at the expense of Rogers.

204.    To ensure that no 1.0 type brewers (which are compatible with non-licensed Compatible Portion Packs) are left on the market,



205.    On information and belief, Keurig has included similar provisions in its current brewer licensing agreements, including licenses for manufacture of current Mr. Coffee, Breville, Cuisinart and Maytag K-Cup type brewers.

**3.    Keurig Used the Impending Release of the 2.0 Brewer to Compel Resellers to Discontinue Purchases of Competing Portion Packs**



50



51



212.   Keurig's aggressive marketing campaign to retailers was consistent with the message conveyed at shareholder meetings and industry group meetings.  Since the public launch of the 2.0 Brewer, Keurig has emphasized to retailers that the system will not brew Competing Portion Packs.  Keurig also emphasized that  Keurig 2.0 will replace the current lineup of both K-Cup and Vue brewers at consumer-friendly price points, and stressed that  this was a very important distinction between 2.0 and the Vue launch.

213.   As one financial analyst who has studied Keurig for many years summed up:

> The core of our thesis was that the company would lose its monopoly position upon expiration of the K-cup patents in 2012, and this has proven to be incorrect.  After expiration, there was a raft of competition which, in the short term, took a substantial share of the market.  In response, GMCR management developed a clever strategy to re-close the system and preserve its monopoly position.  It announced (and recently launched) a new brewer. While GMCR claims that the next generation brewer is for the consumer's benefit, the principal new feature is that it recognizes and refuses to brew coffee from competitor's K-cups. ...  It's hard to see why a consumer would choose the new brewer, which offers fewer coffee choices at higher prices.  Recognizing that its customers are the large retailers than consumers, GMCR scared the retailers, advising them that selling incompatible K-cups would lead to user complaints.  GMCR then convinced the retailers to pressure competitive brands to buy licenses from GMCR, which they did in order to maintain retail distribution. GMCR won back several private label accounts for the same reason.  The result is that GMCR's monopoly is largely restored and our core thesis is defeated.  The company recently announced a 9% price increase on November 1.[2]

---

[2]David Einhorn, *Greenlight Capital Q3 Letter: Gains In Apple; Short Amazon.com (AMZN)?*, ValueWalk (Nov. 5, 2014), , http://www.valuewalk.com/2014/11/greenlight-q3-letter-amzn/.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

     **4.**    **Keurig Knowingly Makes False Claims That Its Lockout Technology Has Consumer Benefits When In Reality There Is No Procompetitive Justification or Product Improvement Resulting From The Lock Out Function**

214.    Keurig refers to the authentication mechanism as "Consumer Benefit Technology," "Beverage Optimization Technology," or "interactive technology" and claims that the authentication mechanism will offer customers several advantages over previous brewers. However, these labels are misnomers and Keurig's claims are without basis. The sole purpose of the authentication mechanism is to lock out competitors; it serves no procompetitive purpose.

215.    For example, Keurig CEO Brian Kelley, at a quarterly earnings call, claimed "Keurig 2.0's interactive capability introduces our beverage optimization technology, allowing the brew to optimize its default settings and brew the beverage perfectly, no matter the beverage type or size."



218.    The Keurig website claims "To make brewing a carafe possible, and to continue to deliver everything Keurig lovers already enjoy – high-quality beverages, simplicity, and variety – our new Keurig 2.0 system will feature specially designed interactive technology allowing the brewer to read information about the inserted Keurig® pack."

53

219.   This is also false.   ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

on the ink for any purpose except to authenticate the Portion Pack inserted as licensed by Keurig.

220.   Additionally, on information and belief, ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████   ██████████

industry analyst Stifel commented on the 2.0 Technology, calling it an "underwhelming innovation."

221.   As another example of an alleged consumer benefit, Keurig claims the authentication mechanism is necessary for safety.   Discussing the "interactive technology," Keurig's website states "[i]t's critical for performance and safety reasons that our new system includes this technology."

222.   This is also false.   ████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

███   ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

███   On information and belief, as of at least 2013, ██████████████

███████████████████████████████████████████████████████

54

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███

225.    Rogers' own testing indicates that its Portion Packs do not pose a "performance" or "safety" concern for customers.  Using a variety of 1.0 brewers, Rogers has brewed tens of thousands of OneCup Competing Portion Packs and has not observed extended use of such packs as decreasing brewer performance.  Nor has the use of Rogers' OneCup Portion Packs caused a safety hazard.

226.    Rogers' use of the 2.0 Brewers confirms that there are no performance or safety concerns.  By cutting the label off of a K-Cup and placing it on the ink sensing mechanism of the 2.0 Brewer, Rogers was able to brew its OneCups.  The Portion Pack brewed successfully with excellent taste and quality, and without any damage to the brewer or harm to the operator.  This process was repeated several times with the same result.

███  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

228.   Nor can Keurig justify locking out competitors and tying K-Cup sales to brewer sales on the basis that closing any purported "system" benefits consumers.   Keurig cannot credibly claim that it closed its "system" in order to lower brewer prices, thereby allowing more consumers to purchase brewers, because Keurig has used closing its purported "system" as an excuse to *raise* — not lower — brewer prices as well as K-Cup prices.

229.   Consumers rely on their ability to brew low-priced Competing Portion Packs in Keurig K-Cup Brewers and have continued to purchase 2.0 Brewers based on the expectation that Competing Portion Packs will work in 2.0 Brewers.   Numerous customers have written to or called Rogers regarding the 2.0 Brewer, upset that Keurig has denied them the ability to select the Compatible Portion Pack they were accustomed to, and concerned that moving forward, they would only be able to use K-Cup Portion Packs.

230.   Although there are no procompetitive justifications for the authentication mechanism, there are several disadvantages.   For example, the authentication mechanism makes it difficult for consumers to brew the Portion Pack of their choice, and many end up disappointed and return Competing Portion Packs.   Additionally, the My K-Cup accessory, which was popular with customers, sold well, and allowed consumers to brew their own blend of coffee grounds in a Keurig Brewer, has been discontinued, because it is not compatible with the authentication mechanism.   ██████████████████████████████████   ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

231.   The only purpose the authentication mechanism serves is to foreclose competition by establishing artificial barriers to entry.   Keurig's claims to the contrary are false and pretextual.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

232.    Keurig has already begun taking advantage of its anticompetitive lock out technology by using the purportedly forthcoming 2.0 technology as leverage with retailers and distributors to try to convince them not to purchase Competing Portion Packs and/or to pressure the manufacturers of Competing Portion Packs to obtain a license from Keurig.

**E.     Keurig Has Made and Continues to Make False and Disparaging Statements About Competing Portion Packs**

233.    Keurig has engaged in systematic disparagement of all Competing Portion Packs – and Rogers' OneCup in particular – with the intent to foreclose competitors from the market. The disparagement includes false and misleading statements to retailers, distributors, consumers and the general public about the quality of the competing products, as well as their safety.

**1.     Marketing to End-User Customers and Consumers**

234.    Beginning in or around September 2011, shortly after Rogers launched its Competing Portion Packs, Keurig launched its "Keurig Brewed" advertising campaign. On information and belief, as part of this campaign, Keurig has made regular, repeated false and misleading statements directly to customers through a variety of traditional and social media advertising platforms.

235.    Part of the Keurig Brewed campaign has focused on safety, suggesting that Competing Portion Packs are unsafe and will damage K-Cup Brewers.  For example, when Keurig launched the campaign, the website included statements such as "Keurig Brewed is … our seal of approval that assures the quality, taste and safety of every cup" suggesting that Competing Portion Packs are not safe.

236.    As another example, on information and belief Keurig representatives took to social media to suggest that the Rogers' Portion Packs contained "stale coffee" and were exposed to excessive amounts of oxygen.  However, the statement is demonstrably false because Rogers' Portion Packs are sealed in airtight bags.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

237.   Similarly, Keurig uses extensive safety messaging on the Keurig Brewed website today, for instance "[e]very product with the seal has passed rigorous testing, assuring the quality, taste and safety you expect from Keurig."

238.   On information and belief, Keurig representatives regularly tell customers not to use Competing Portion Packs, including Rogers' OneCup, stating that Competing Portion Packs will break the brewer and void the warranty.   Those customers often write Rogers reporting Keurig's misinformation.   Keurig informed several customers that Rogers' OneCup will 'gum up' the machine, and cause it to stop functioning.   A Keurig representative asked another customer what type of Portion Pack they were using; when they explained they had used Rogers, Keurig falsely stated that the OneCup had caused the brewer to fail and refused to honor the warranty.   *See* Exhibit 13.

239.   On information and belief, these types of complaints are the norm.   Customers contacting Keurig's call centers revealing they are using Competing Portion Packs are told that such packs will break the brewer and that their warranties will not be honored.

240.   As another example, on information and belief, Keurig has taken to social media to tell Portion Pack users that Competing Portion Packs are unsafe and of inferior quality compared to Keurig's offerings.   For instance, on information and belief, in March 2014, Keurig replied to a Twitter post from a Rogers customer praising one of Rogers' OneCup products. Keurig stated on Twitter "For best performance and warranty protection, we suggest using Keurig Brewed products in your brewer."

241.   Taken together, these statements and similar statements give the false and misleading impression that Rogers' OneCups and other Competing Portion Packs are not tested, that they are not designed to work in Keurig brewers, and that use of Rogers' Competing Portion Packs is unsafe for the consumer and may damage the brewer.

242.   The suggestion that Rogers' OneCup is unsafe or damages Keurig brewers is false.   As discussed above, Rogers has conducted tens of thousands of tests on its OneCup and

determined that it does not pose a safety hazard or decrease the longevity of its brewer. *See* ¶ 223-227.

243. The Keurig Brewed campaign also has repeatedly stated that Keurig "does not make or test other brands." This or similar statements are contained on Keurig's website, ██ ████████████████████████████████ and in social media advertising.

244. This statement is significant for several reasons. Keurig's statement that it does not make or test other brands, taken as true, is further evidence that Keurig knowingly misled consumers when it suggested statements that Competing Portion Packs, including Rogers' OneCup, are unsafe, or that they break Keurig brewers.



246. As another part of the Keurig Brewed campaign, Keurig also has designed consumer advertising to emphasize brand variety. For example, Keurig's 1 minute "Keurig(R) 2.0" introduction, hosted by Keurig on its website and on other video distributors such as YouTube, emphasizes brand variety, with scrolling pictures of different K-Cup lids, and statements such as "250+ varieties" and "40+ brands." Similar statements are seen in other videos, in print advertising, on Keurig's website and on social media. On information and belief, this messaging is intended to give consumers the impression that the 2.0 Brewer offers the greatest variety in Portion Packs when compared with other Keurig brewers.

247. These statements regarding brand variety are misleading because the 2.0 Brewer functions with far fewer varieties than previous brewers. As discussed above, while 1.0 brewers would interoperate with Portion Packs from Rogers, TreeHouse, Marley Coffee, Coffee Club and many others, the 2.0 Brewer will only work with brands licensed by Keurig. Contrary to Keurig's marketing message, the 2.0 Brewer actually offers less variety than previous brewers.

59

248.    Chris MacDonald of the Canadian Business Times wrote "I promptly bought a shiny new Keurig 2.0 (with a number of fancy new features) at Costco.   Nowhere on the packaging did Keurig inform me that most of the dozen or so boxes of coffee and tea currently in my basement (well over $100 worth) simply will not work in the new machine."   Chris MacDonald, *When Keurig fights "coffee pirates," who loses? Loyal consumers*, Canadian Business (Oct. 10, 2014), http://www.canadianbusiness.com/blogs-and-comment/keurig-coffee-piracy-obsolescence-ethics/.

249.    Similarly, many consumers have complained to Rogers that they did not know that the 2.0 Brewer would not work with their favorite coffee until after they had already purchased the brewer.

250.    Customers who attempt to brew a Competing Portion Pack often encounter the "Oops" screen, another false and misleading message.

251.    When a Keurig 2.0 Brewer detects a Competing Portion Pack, it displays the message "[t]his pack wasn't designed for this brewer."   This statement is misleading.   For example, Rogers' OneCup was designed to function with all K-Cup Brewers, including the Keurig 2.0.   Instead, on information and belief and as discussed above, Keurig designed the 2.0 Brewer so that it would reject Competing Portion Packs.

252.    On information and belief, in mid 2014, before the design of the 2.0 Brewer was finalized, the brewer was programmed to display a much more accurate message "Keurig 2.0 brewers can only brew packs with the Keurig logo."   Shortly before the 2.0 Brewer launched, the language was changed to the present language that was specifically crafted to mislead customers into believing that Competing Portion Pack manufacturers, and not Keurig, were responsible for the incompatibility.

253.    On information and belief, consumers that called Keurig to complain about the lock out were given additional false and misleading statements. ████████████████

████████████████████████████████████████

████████████████████████████████████████

60

██████████████ ████████ ███████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████

254.    As discussed above, these statements misrepresent the Keurig 2.0 technology: ███

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████    *See* ¶¶ 216-219.

255.    On information and belief, this false and misleading advertising will continue. Keurig has stated that it intends to surround the consumer with Keurig 2.0 messaging and is investing tens of millions of dollars into a variety of marketing activities including print advertising, social media outreach, merchandising reset, live demo samplings and consumer PR events

### 2.    Marketing to Retail Customers

256.    Unlike its marketing to consumers, which downplayed compatibility issues,

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████

61

257.    As discussed above, Keurig used its market power in the Single Serve Brewer Market, and significant subsidies for its brewers, to coerce retailers into stocking the 2.0 Brewer, despite the loss of functionality.  *See* ¶¶ 107-111. 193-198.

258.    On information and belief, Keurig also used several false and misleading statements in marketing material widely distributed to retailers to compel them to carry the 2.0 Brewer.

259.



261.    Additionally, at stockholder meetings, Keurig stated that the lock out feature was necessary to enable the carafe brewing feature.

> And **we've shown it to our retailers and retailers** are very, very excited about what this can do to extend the business and I'll show you why we're exacted too but **importantly it uses the proprietary technology that can identify and perfectly brew each pod that you put in and it needs to be identify that pod** and we will show you why and it can identify the pod **and then open up the software requirement for the machine to be able to brew the pod and customize the pod to your choice.**
>
> …
>
> Now with that comes the need to be interactive and to be able to the ability to read a pod. And so the way that's worked is we put the pot in, **we have a very special and proprietary capability on that pod on the lid itself that the machine is able to read and then it brews exactly to what that pod needs. Now it's**

62

**important to do it because the benefit to the consumer is that when the carafe cup goes in it will only let them brew the sizes that fit a carafe and it's really important that when an 8-ounce cup goes under the dispenser that it doesn't brew 32 ounces of coffee at a 190 degree which we certainly don't want in our kitchen or on our counters.** And so we have to have the ability to be able to read the cup and to and able to deliver exactly what the consumer wants and that's what K2.0 is that's what our Keurig 2.0 machine does.

*Green Mountain Coffee Roasters' CEO Hosts Annual Meeting of Shareholders (Transcript)*, Seeking Alpha (Mar. 6, 2014), http://seekingalpha.com/article/2073423-green-mountain-coffee-roasters-ceo-hosts-annual-meeting-of-shareholders-transcript.

███ ████████████████████████████████████████████

████████████████████████

263.   As discussed above, these statements are false.  The brewer does not recognize the Portion Pack inserted and instead, the lock out feature is only used to determine whether a Portion Pack is or is not licensed.  Similarly, the lock out feature does not make brewing simpler.

████████████████████████████████████████████████

████████████████████████████████████████████████

Moreover, the lock out feature is separate from the carafe brewing feature.  ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████   *See also* ¶¶ 216-219; 253-254.

264.   On information and belief, Keurig also misled retailers into believing that the 2.0 Brewer's carafe feature was widely desired by customers.  ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

63

████████████████████████████████████

████████

265.    On information and belief, similar statements were made to most of the retailers with which Keurig met, and on earnings calls throughout 2013 and 2014.

266.    These statements are false and/or misleading, as Keurig did not share data on their follow-up questions.  Specifically, on information and belief, ██████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

267.    On information and belief, Keurig knew, based on its survey data, that consumer interest was low in the carafe brewing functionality as offered, but withheld this information from retailers in order to drive adoption of the Keurig 2.0 Brewer.

### THE HARM CAUSED BY KEURIG'S ANTICOMPETITIVE CONDUCT

268.    Keurig's anticompetitive acts identified above have had serious anticompetitive effects on Rogers and on competition in the Portion Packs Market, and in particular the Compatible Portion Packs Market.  In addition to Rogers, Keurig's anticompetitive conduct has harmed other Competing Portion Packs manufacturers, potential market entrants, distributors, retailers, and, most importantly, consumers.

269.    Keurig's anticompetitive conduct coupled with its monopoly power in both the Single Serve Brewer and Compatible Portion Pack Markets has made it nearly impossible for Rogers to compete in the Compatible Portion Packs Market.  Specifically, Keurig's loyalty provision within its exclusive agreements with AFH distributors coupled with its threats of enforcement and customers' fears of retribution from Keurig have almost entirely shut Rogers out of the AFH segment.  Rogers' current OneCup sales to customers in the AFH segment amount to ████████ of Rogers' OneCup business.  On information and belief, other Competing Portion Pack manufacturers also have been unable to operate in the AFH market.

64

270. Rogers and other Competing Portion Pack manufacturers have lost At-Home customers for both private label and branded Portion Packs, and are at imminent risk of losing even more, due to Keurig's marketing efforts geared at disparaging Competing Portion Packs and promoting the Keurig 2.0 Brewer's lock out feature. An example of the impact of Keurig's conduct is evident by Rogers' loss of business despite Rogers' low prices and highly regarded product.

271. At a meeting between Rogers and Costco on January 31, 2014, Rogers was told that despite having prices lower than all other suppliers' Portion Packs – including Costco's Keurig-made private label – Costco would not be widening distribution for Rogers, or any other Competing Portion Pack supplier, until the Keurig 2.0 compatibility issue was resolved. During this same meeting, Costco informed Rogers that it would be requiring Rogers to implement a design change to its Costco packaging to inform customers that Rogers' products were not compatible with the Keurig 2.0 Brewer. This packaging design will undoubtedly act as a scarlet letter branded on Rogers' products that leaves consumers with the impression that Rogers' product is somehow inferior and deters them from purchasing its products, even if those consumers do not own a 2.0 Brewer.

272. Other retailers have recently declined to purchase or delayed purchasing decisions for Rogers' branded OneCups based on the impending introduction of the 2.0 Brewer. The Army & Air Force Exchange Service (AAFES) informed Rogers on March 24, 2014 that it would no longer purchase Rogers' OneCups because it would only purchase Portion Packs compatible with 2.0 Brewers. Similarly, on July 17, 2014, the Bon-Ton Stores informed a Rogers' distributor that it was not interested in Rogers' OneCups because they will not work with the new Keurig 2.0 Brewer. And Meijer has continually delayed its decision to purchase Rogers' OneCups due to ongoing discussions between Meijer and Keurig relating to the impending introduction of the 2.0 Brewer. The 2.0 Brewer lock out or KAD restrictions have caused Rogers to recently lose accounts with at least the additional following potential

65

customers: Sears, Aramark, Navy Exchange Service Command, Quill Corp., Royal Cup Coffee, and OfficeMax.

273.    Rogers also lost significant private label business due to the 2.0 Brewer lock out. On April 8, 2014, after spending eighteen months developing a private label OneCup product for grocery store giant Kroger, Rogers was informed that Kroger would only use Rogers for its private label products until January or February 2015 rather than the customary multi-year arrangement, and would then be transitioning its private label Portion Packs to Keurig to ensure compatibility with the 2.0 Brewer.  Shortly after receiving news regarding Kroger, Rogers' second largest retail customer - BJ's Wholesale – announced that it would be working with Keurig for its private label brand after Keurig and BJ's executives had a high level discussion relating to the 2.0 Brewer and its incompatibility with Competing Portion Packs.  And on June 5, 2014, Wakefern – the largest retailer-owned grocery cooperative in the United States, which owns the ShopRite and Price Rite grocery chains – informed Rogers that it was tabling discussions while in the final stages of development of an organic private label Portion Pack product.  Other retailers, including Big Y and Shoprite have all delayed their private label purchase decisions as a result of Keurig's statements regarding the Keurig 2.0 Brewer's incompatibility with Competing Portion Packs.  Since Keurig controls over 89% of the Single Serve Brewer Market and has committed to producing and selling only 2.0 Brewers, Rogers' foreclosure from the 2.0 Brewer market would equate to Rogers' foreclosure from the entire Compatible Portion Pack Market.

274.    The loss of sales, goodwill, and business opportunities threatens to devastate Rogers' ability to stay in business.  Rogers' relative lack of resources for marketing campaigns, its small size and its recent entry into the market make it particularly vulnerable to Keurig's aggressive campaigns against Competing Portion Packs.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

276.    Keurig has readily admitted that the traditional coffee business is declining, that single-serve is driving growth for the total coffee category, and that single serve will continue momentum while drip will decline.  It acknowledges that fewer consumers are buying traditional drip coffee makers each year, and instead are opting to purchase Single Serve Brewers.

277.    Currently, over 40% of Rogers' sales are related to OneCup.  Losing this share of its sales – and the potential business opportunity to participate in the rapidly growing single-serve category – would endanger Rogers' entire business.

278.    Rogers is also injured by Keurig's false and misleading representations made in its marketing and advertising blitz to retailers and consumers.  Rogers' customers and potential customers are concerned about the impact of the 2.0 Brewer on their sales of Competing Portion Packs, and as a result, the 2.0 Brewer lock out has had a chilling effect on OneCup sales. Customers have, in fact, reduced or postponed their orders of OneCups or stopped purchasing OneCup Portion Packs altogether because of fear that the 2.0 Brewer will not function with the OneCup and thus that there will be less demand for the product.  These concerns have been expressed – and been acted on – by very large retailers such as Costco, which has required that Rogers change its packaging to designate that OneCup packs will not work with 2.0 Brewers and by individual consumers who have called Rogers' customer service lines concerned that they will be prevented from continuing to brew their OneCups in Keurig brewers.

279.    In the Northeast U.S., the region where Single Serve Brewers have become most popular, Rogers' Regional Sales Manager reported that numerous customers and potential customers were either concerned about or outright refused to purchase OneCups because of the 2.0 lock out issue, including Bed, Bath & Beyond, Big Y, A&P, Delhaize, Garber Bros., Bozzutos, Fairway, Shoprite, and Ingles.  Rogers' OneCup sales are being suppressed by Keurig's statements about the 2.0 Brewer lock out.

280.    Finally, the 2.0 lock out has materially hindered Rogers' opportunities to serve customers in the Private Label Market.  Private label single-serve coffee sales increased 1,990% in the 52-week period ending October 6, 2013.  Rogers was one of the first manufacturers to

67

contract private label Portion Pack sales and it met with some initial success. However, following the announcement of Keurig 2.0 with the ability to lock out Compatible Portion Packs not licensed by Keurig, Rogers has lost significant potential private label business. As noted above, the announcement and launch of the Keurig 2.0 caused customers including Kroger, BJ's and Wakefern to halt ongoing private label negotiations. Rogers has lost (and stands to continue losing) private label business as a result of the 2.0 lock out.

281. The Kroger grocery chain has 2,640 stores in 35 states, reaching millions of customers. The negative spillover effect of Keurig's actions is apparent in Rogers' relationship with Kroger. Rogers has been informed that because Kroger is entering into an exclusive relationship with Keurig, Kroger will no longer be able to carry Rogers' tea packs which had been authorized and sold in Kroger stores.

282. Both Costco, the largest warehouse store chain in the U.S., with 649 warehouses in 43 states and Puerto Rico, and 71.2 million members nationwide, and BJs, another chain wholesaler which operates over 200 clubs in 15 different states, have begun pressuring Rogers to take a license from Keurig or lose business. It is clear that the damage and loss to Rogers has been and will continue to be substantial as Keurig's anticompetitive conduct continues.

283. This injury is not unique to Rogers. Independent media sources have widely reported that retailers are shunning Competing Portion Packs, especially for their private label brands, resulting in decreased consumer choice. For instance:

> Jagdale [analyst for KeyBank] sees signs that the strategy is already working. He notes that several retailers...that had been unlicensed have recently entered into licensing arrangements with Keurig. He suggests that retailers prefer sharing coffee packet revenue with Keurig to being locked out of the business entirely.

Norm Alster, *Keurig Brews Plan For Coffee Domination, Fizzy Profit*, Investor (July 17, 2014), http://news.investors.com/business-the-new-america/071714-709211-keurig-green-mountain-brews-coffee-and-soda-plan.htm?p=2. Furthermore:

> Who ultimately loses in this fight? Arguably the consumer. Not only has choice been restricted, but there's also an enormous information gap. Keurig has done a less than stellar job—I'm

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

> being charitable, here—of informing consumers about their new DRM system. The result has been frustration, both with the newly-limited choice of pods, but also with coffee machines that don't work as expected.

Chris MacDonald, *When Keurig fights "coffee pirates," who loses? Loyal consumers*, Canadian Business (Oct. 10, 2014), http://www.canadianbusiness.com/blogs-and-comment/keurig-coffee-piracy-obsolescence-ethics/.

284.  Indeed, Keurig itself has bragged about the rapid conversion of Competing Portion Packs to licensed partners, stating it is confident that it will get a significant piece of the Competing Portion Pack Market.  Numerous licensing deals have been announced since the Keurig 2.0 Brewer was released, including with Keurig's previously largest competitors, Kraft and Nestle.  Keurig has rebounded from a low of about an 85% share of the Compatible Portion Pack Market to a 95% share.

285.  Keurig correctly anticipated that the lock out feature of the Keurig 2.0 will force non-licensed manufacturers to take a license, stating:

> we expect unlicensed share of the system to grow through first half fiscal year 'and begin to decline in the second half and thereafter… we expect to continue to make progress in our discussions with many of the other unlicensed participants over the next 12 to 18 months as Keurig 2.0 is introduced.

*Green Mountain Coffee Roasters' CEO discusses F1Q 2014 Results – Earnings Call Transcript*, Seeking Alpha (Feb. 6, 2014), http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript.

286.  Keurig's actions harm consumers by maintaining the artificially high price of Compatible Portion Packs and by eliminating consumer choice.  On average, Keurig's branded and licensed Portion Packs are 15-25% more expensive than Competing Portion Packs.  Rogers' OneCup product has been 97% biodegradable since October 2013, whereas Keurig has not committed to recyclability until 2020.

287.  On information and belief, as Rogers and other Competing Portion Pack manufacturers are driven from the market, and Keurig K-Cup prices return to their pre-competitive levels, consumers of Compatible Portion Packs both in the AH and AFH markets

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

will be forced to pay at as much as 58% more for K-Cup Branded Portion Packs than they would have for Rogers' OneCup or other Competing Portion Packs.

288.    On information and belief, market research has shown that Keurig users remain highly price sensitive and willing to try new K-Cup brands if they are less expensive. In fact, 90.9% of Keurig users replied that they would try a new K-Cup brand if it were less expensive. This is more supporting evidence that K-Cup users would not necessarily be loyal to a particular brand if they found a more inexpensive option. Thus, consumers do not voluntarily pay the supracompetitive prices charged by Keurig for the K-Cup Branded Portion Packs but rather are forced into paying these supracompetitive prices based upon the lack of access to Competing Portion Packs that results from Keurig's anticompetitive conduct.

289.    Keurig's anticompetitive conduct has severely limited consumers' access to Competing Portion Packs. This restricted access has been especially harmful to consumers who prefer the taste, flavor, and/or quality of Competing Portion Packs over K-Cups. One market study observed that while there are more licensed K-Cups in the top 100 on Amazon, unlicensed Competing Portion Packs actually had a better average ranking. For example, Rogers' OneCups have an average rating of 4.5 stars on Amazon.com, and Rogers' San Francisco Bay Coffee Fog Chaser is recognized as the "#1 Best Seller" in Beverages on Amazon.com.

### 1.    Rogers' Product is Environmentally Friendly, and Keurig's is Not.

290.    But for Keurig's anticompetitive behavior, the eco-friendly characteristics of OneCup (increasingly important to U.S. consumers) should have given it greater access to retailers. Organic and other specialty coffees such as fair trade and shade-grown brands often carry a price premium. Academic studies have reported that organic coffees commanded on average price premiums of 10 to 15 percent in 2002; 15 to 50 percent (2003); 39 percent (or 108 percent for fair-trade certified organic coffee) (2003/2004); 30 percent (2004); US$0.28 and US$0.24 per pound (in 2005 and 2006, respectively); 30 and 40 percent (2005 and 2006, respectively); 15 to 20 percent (2007); US$0.15 to 0.30 per pound (2007); and 20 percent (2008). Yet, as noted above, Rogers' Portion Packs regularly retail at prices well below Keurig's.

70

291.    While the demand for conventional coffee has decreased, demand for "differentiated or specialty coffees" has increased.  In 2000, there were 62 licensed fair trade roasters and 13 fair trade importers in the U.S.  In 2006, these same figures were 395 and 68, respectively.  In 2012, figures indicated that 36% of responding consumers favor eco-friendly packaging (compared to 28% in 2010).  59% of consumers who responded to this survey stated that seeing environmental claims on packaging encouraged them to buy more of that brand.

292.    These statistics go directly to one of the leading complaints about Keurig's K-Cups:  that they are environmentally unfriendly and add to land-fill mass.  Keurig and its licensees use plastic and tinfoil pods that are non-recyclable and non-biodegradable.  Although some reports say that 5 percent of the Portion Packs made by Keurig contain recyclable plastic, the aluminum lid must be separated from the cup, and the cups must be emptied of wet grounds for the materials to enter the recycling process.  Because recycling facilities filter objects by size and density, it is unlikely that any K-Cups will make it through the recycling process.

293.    While the media has emphasized environmental issues associated with the end life of K-Cups, Michael Dupee, the Vice President for Social Responsibility at Keurig has been quoted as saying "'the majority of the environmental impact of this product' is not its disposal." This suggests that Keurig's production process (aside from disposal of the end product itself) gives rise to greater environmental impacts.  Absent barriers to competition, Rogers' cheaper, environmentally-friendly, and quality product should have experienced rapid share growth – but this has not happened.  Thus, Keurig has powerful economic incentives to restrict Rogers' access to the marketplace until Keurig can, itself, manufacture a more environmentally friendly Portion Pack.

71

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Monopolization**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

294.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 293 as fully set forth herein.

295.    As detailed above, Keurig has monopoly power in the Portion Packs Market and the Compatible Portion Packs Market, including the power to control prices and exclude competition.

296.    As explained above, Keurig has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

297.    Keurig has effectively restrained, and threatens to restrain further, competition in the Portion Packs Market and Compatible Portion Packs Market by:

  a. coercing distributors and retailers to enter into anticompetitive exclusive agreements that restrain market entry, exclude competitors, and unreasonably restrain competition;

  b. conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, unreasonably restrain competition, allocate markets, and limit output;

  c. filing objectively and subjectively baseless litigations and appeals against manufacturers of Competing Portion Packs, including Rogers, for the purpose of obtaining a competitive advantage in the Compatible Portion Packs Market;

  d. tying the purchase of K-Cups to the purchase of K-Cup Brewers in order to unreasonably restrain competition from Competing Portion Pack manufacturers;

e.   interfering with Rogers' business relationships by making false and disparaging comments to customers and potential customers regarding Rogers' products and attempting to dissuade retailers and distributors from doing business with Rogers on the basis that Rogers' Competing Portion Packs will not be compatible with 2.0 Brewers;

f.   threatening to unreasonably restrain competition through the introduction of technology that unnecessarily and unjustifiably excludes competitors from the Compatible Portion Packs Market and that cannot be justified based on any legitimate, non-pretextual consumer benefit; and

g.   raising competitors' costs above those that would exist under competitive conditions by requiring the manufacturers of Competing Portion Packs to enter purported licensing agreements that, among other things, restrict potential brand licensing and other distributor networks for Rogers and other potential Competing Portion Pack suppliers.

h.   making material misrepresentations to retailers, distributors, and consumers regarding the compatibility, performance, safety, and quality of Competing Portion Packs as compared to K-Cups in order to perpetuate its Portion Pack and Compatible Cup Market monopolies by deterring customers from doing business with Competing Portion Pack manufacturers and thereby also dissuading other potential competitors from entering the market.

298.   Each of these anticompetitive acts is sufficient to constitute an antitrust violation, and, taken together, they clearly establish illegal monopolization in violation of the federal antitrust laws.

299.   As a direct, foreseeable, and proximate result of Keurig's anticompetitive and monopolistic conduct, Rogers has been injured in its business with damages in amounts to be proven at trial.  In particular, Rogers has been substantially foreclosed from competing in the

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

Portion Packs Market and Compatible Portion Packs Market; Rogers has had to incur substantial costs and attorneys' fees to defend against the objectively baseless patent litigation pursued by Keurig; and Rogers has lost business as a result of Keurig's interference with its relationships with retailers and distributors, its claims that Competing Portion Packs will be incompatible with 2.0 Brewers, and other deceptive and disparaging conduct.  Absent Keurig's anticompetitive acts, Rogers would have made substantially more sales of Portion Packs.

300.    As a direct, foreseeable, and proximate result of Keurig's anticompetitive and monopolistic conduct, competition, suppliers, retailers, distributors, commercial customers, and consumers in the Portion Packs Market and in the Compatible Portion Packs Markets have been harmed by, among other things: (1) Keurig's ability to charge supracompetitive prices for K-Cups; and (2) the reduced output and availability of consumers' preferred Compatible Portion Packs.

301.    Unless Keurig is enjoined from enforcing its anticompetitive exclusive dealing agreements, from making false and disparaging statements about Rogers and its products, and from implementing the lock out feature of its proposed 2.0 Brewers, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its business and goodwill, which would be lost not as a result of fair competition but rather as a result of Keurig's anticompetitive conduct.  Given the nature of the irreparable harm to Rogers in the form of lost business and goodwill, this harm will be difficult to quantify.

302.    Keurig agents that participated in Keurig's unlawful activities include Sagentia Ltd. and Motiv, which conspired with Keurig in 2012 to lock out competitors in order to give Keurig a market lead sufficient to recapture its complete market dominance and unlawfully maintain its monopoly position.  On information and belief, Sun Chemical Corporation has entered into an exclusionary contract with Keurig for the supply of taggant ink used on 2.0 K-Cup lids.

303.    On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiffs, are co-conspirators with Keurig in its unlawful activities.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

## SECOND CLAIM FOR RELIEF

**Exclusive Dealing**
**Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2**
**and Section 3 of The Clayton Act, 15 U.S.C. § 14**

304. Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 303 as fully set forth herein.

305. As detailed above, Keurig has monopoly power in the Single Serve Brewer Market, Portion Packs Market and the Compatible Portion Packs Market, including the power to control prices and exclude competition.

306. Portion Packs are "goods, wares,…or commodities" within the meaning of 15 U.S.C. § 14.

307. Keurig has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with competitor roasters, competitor coffee brands, distributors and retailers.

308. These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage. In particular, Keurig's exclusive dealing agreements prohibit retailers and distributors from marketing or selling any Competing Portion Packs and thereby Rogers' Competing Portion Pack products are entirely foreclosed from competing in a substantial portion of the Compatible Portion Packs Market not as a result of competitive forces but solely on the bases of these anticompetitive agreements.

309. This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because the restrictions imposed by Keurig do not apply to the sales of any products into any market other than the Compatible Portion Packs Market. Instead, Keurig's exclusive dealing agreements are forced upon Keurig's business partners for the sole purpose of protecting its monopoly in the Portion Packs Market and Compatible Portion Packs Market.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

310. This conduct has substantially foreclosed competition in the Portion Packs Market and Compatible Portion Packs Market, including substantial competition from Rogers. Rogers has lost significant sales and profits as a result of the Keurig exclusive dealing contracts.

311. Unless Keurig is enjoined from enforcing these exclusive dealing agreements, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its business, which would be lost not as a result of fair competition but rather as a result of these anticompetitive exclusive dealing agreements. Given the nature of the irreparable harm to Rogers in the form of lost business, this harm will be difficult to quantify.

## THIRD CLAIM FOR RELIEF

### Monopoly Leveraging
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

312. Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 311 as fully set forth herein.

313. As detailed above, Keurig has monopoly power in the Single Serve Brewers Market, including the power to control prices and exclude competition.

314. Keurig has willfully and intentionally used its monopoly power in the Single Serve Brewers Market to maintain or attempt to maintain monopoly power in the Portion Packs Market and Compatible Portion Packs Markets. Specifically, Keurig has engaged in a strategy of selling its K-Cup Brewers at or below cost in order to lock consumers into the Compatible Portion Packs Market, then coercing companies, based upon its monopoly in the Single Serve Brewers Market, to sign anticompetitive exclusive agreements prohibiting them from dealing with Keurig's competitors in the Compatible Portion Packs Market.

315. Keurig is threatening to further leverage its monopoly power in the Single Serve Brewers Market to maintain its monopoly power in the Portion Packs Market and Compatible Portion Packs Market by programming its 2.0 Brewers to work exclusively with K-Cup Branded Portion Packs not on the basis of any legitimate consumer benefit but for the sole purpose of monopolizing the Compatible Portion Packs Market.

76

316.   Keurig willfully acquired and maintained monopoly power by the exclusionary conduct detailed above, rather than through efficiency or innovation.  Rogers has been injured by Keurig's anticompetitive conduct through lost sales and profits.

317.   Unless Keurig is enjoined from enforcing its anticompetitive exclusive agreements and from implementing the lockout feature of its proposed 2.0 Brewers, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its business, which would be lost not as a result of fair competition but rather as a result of Keurig's anticompetitive leveraging of its monopoly power in the Single Serve Brewer Market.  Given the nature of the irreparable harm to Rogers, this harm will be difficult to quantify.

## FOURTH CLAIM FOR RELIEF

### Sham Litigation
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

318.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 317 as fully set forth herein.

319.   Just weeks after Rogers entered the Compatible Portion Packs Market, Keurig willfully and intentionally asserted meritless claims against Rogers, alleging in bad faith, with no objective or subjective basis, that Rogers' Competing Portion Packs infringed Keurig's utility and design patents directed at K-Cup Brewers and methods of using brewers and that Rogers induced consumers to infringe these Single Serve Brewer patents by using Competing Portion Packs that allegedly infringed the patents.  Keurig's non-patent claims were likewise objectively baseless, and brought with the intention to use the litigation process itself to harm Rogers, specifically, and to limit competition generally.

320.   Despite the fact that Keurig had a pending appeal of the District of Delaware case against Sturm Foods on Keurig's utility patent claims – which were related to the most significant claims asserted by Keurig against Rogers in the District of Massachusetts lawsuit – Keurig refused to agree to a stay of discovery in the District of Massachusetts case pending resolution of Keurig's appeal of the District of Delaware case and instead vigorously pursued

77

costly, time-consuming and burdensome discovery and pushed for a *Markman* hearing on the utility patents. Such discovery included, but was not limited to, the taking of 13 days worth of depositions of Rogers' employees and top executives.

321.   In May 2013, the United States District Court for District of Massachusetts granted summary judgment in favor of Rogers on Keurig's patent claims. The Court chastised Keurig for "attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig brewers. Supreme Court precedent prevents plaintiffs from undertaking such an end run." *Keurig, Inc. v JBR, Inc.*, 2013 U.S. Dist. LEXIS 73845, at *35.

322.   Keurig then appealed the District of Massachusetts' ruling to the Federal Circuit. Although Keurig agreed not to pursue its appeal related to the utility patents given the Federal Circuit's ruling in the District of Delaware case, Keurig continued to pursue its appeal related to the equally meritless claims asserted based upon the design patent. The Federal Circuit entered a judgment on March 12, 2014, just six days after oral argument, affirming the district court's grant of summary judgment in favor of Rogers and denying Keurig all of the relief sought in its appeal.

323.   Rogers has incurred substantial litigation costs and attorneys' fees based on Keurig's objectively baseless claims that limited its ability to compete effectively.

324.   No reasonable litigant could have realistically expected to succeed on the merits of Keurig's claims against Rogers, and thus Keurig's litigation and pursuit of its appeal were objectively baseless.

325.   On information and belief, Keurig's litigation against competitor Sturm was equally as baseless.

326.   On information and belief, Keurig instituted its meritless lawsuit against Rogers as part of its overall anticompetitive scheme to interfere directly with Rogers' ability to compete in the Compatible Portion Packs Market, to intimidate market entrants, to raise its rival's costs, to harm Rogers' reputation and interfere with its business relations, and to deprive Rogers of

78

resources that would have otherwise been spent on bringing Competing Portion Packs to consumers at favorable prices.

327.   As a result of this sham litigation and appeal, Rogers was forced to incur litigation fees and costs, rather than use those resources to compete against Keurig.   Competition in the market for Compatible Portion Packs has thus been harmed.

328.   Keurig's vexatious litigation strategy was successful in maintaining its competitive advantage.  Both Rogers and Sturm were forced to spend money and time defending the lawsuits.  Moreover, the lawsuits were used by Keurig to sow doubt and confusion about the viability of competing unlicensed Portion Packs.  On information and belief, Keurig used the existence of the lawsuit in order to convince distributors and third parties to stop doing business with Rogers and Sturm.

329.   The lawsuit created confusion in the market as Keurig assured consumers that it would win and would secure an injunction to prohibit the supply of non-licensed Portion Packs. Rogers devoted significant resources to the defense against these baseless claims, including approximately $2 million in legal costs and fees.  On information and belief, Rogers lost many potential and actual customers due to the lawsuit.

330.   On information and belief, Keurig initiated the suits against Sturm and Rogers knowing that it could not prove infringement due to patent exhaustion.   On information and belief, rather than attempting to prove infringement, the real reason that Keurig initiated these suits was to harm Rogers' and Sturm's ability to compete with Keurig's Compatible Portion Packs business by causing Rogers and Sturm to divert resources from marketing their respective Compatible Portion Packs businesses to defend against Keurig's claims and to incur substantial legal fees associated with their defenses, thereby increasing of the costs Rogers' and Sturm's Compatible Portion Pack products.  On information and belief, Keurig initiated these suits to harm Rogers' and Sturm Foods' ability to compete with Keurig's Compatible Portion Packs business also by creating confusion and doubt among Rogers' and Sturm's potential and existing customers about the commercial viability of Rogers' and Sturm's Compatible Portion Pack

79

products, and by delaying Rogers' and Sturm's ability to grow their respective Compatible Portion Pack businesses. Keurig's reasons for initiating these suits is evidence by its vexatious litigation tactics and continued prosecution of meritless patent infringement claims.

331.    On information and belief, this conduct harmed consumers of Compatible Portion Packs by allowing Keurig to charge supracompetitive prices and by delaying the growth of superior Competing Portion Packs that compete with Keurig's Compatible Portion Packs.

### FIFTH CLAIM FOR RELIEF

#### Patent Misuse

332.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 331 as fully set forth herein.

333.    The *Keurig v. JBR, Inc.* litigation alleged that Keurig's patents directed at brewers and methods of using brewers were infringed by Rogers and Keurig's consumers using Rogers' Competing Portion Packs in K-Cup Brewers.

334.    As noted above, the United States Court of Appeals for the Federal Circuit has already affirmed both district courts' grants of summary judgment. Keurig was not properly seeking enforcement of any patent rights, but rather was trying to make an "end-run" around the patent laws. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d at 1374. Keurig's improper "end run" against Sturm and Rogers constitutes patent misuse.

335.    By seeking to "impermissibly restrict" purchasers of K-Cup Brewers from using Competing Portion Packs on the basis of its brewer and brewing method patents, (and similarly having sought to restrict suppliers of those Competing Portion Packs, like Rogers and Sturm) Keurig willfully, intentionally, and unlawfully broadened the scope of its patents and, moreover, threatens to do so again in the future.

336.    In addition, by seeking to condition consumers' use of its K-Cup Brewers on the use of its K-Cups through its K-Cup Brewer patents and not any patents held on the K-Cups themselves, Keurig engaged in, and threatens to continue to engage in, an unlawful tying arrangement, constituting per se patent misuse.

80

337.    As a result of Keurig's patent misuse, competition has been harmed because, among other things, Keurig's patent misuse has substantially foreclosed its competitors from the Compatible Portion Packs Market, Rogers has been forced to incur legal costs and attorneys' fees that otherwise could have been spent bringing more Competing Portion Packs to the market, and consumers have had reduced access to Competing Portion Packs.

### SIXTH CLAIM FOR RELIEF

**Tying**
**Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2**
**and Section 3 of The Clayton Act, 15 U.S.C. § 14**

338.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 337 as fully set forth herein.

339.    Keurig intends to tie 2.0 Brewer purchases to the purchase of K-Cup Branded Compatible Portion Packs by technologically locking out Competing Portion Packs.  By willfully and intentionally imposing a technological tie between the 2.0 Brewers and K-Cup Branded Portion Packs, Keurig will condition the use of the 2.0 Brewers on a consumer's purchase of K-Cup Branded Portion Packs.   2.0 Brewer consumers will be forced to forgo purchasing Competing Portion Packs, because Keurig purportedly will refuse to unlock the brewers to allow those cups to work with the 2.0 Brewers.

340.    Portion Packs are "goods, wares,...or commodities" within the meaning of 15 U.S.C. § 14.

341.    Sun Chemical Corporation has entered into an exclusionary contract with Keurig for the supply of taggant ink used on 2.0 K-Cup lids.

342.    Keurig's tying arrangement will affect a substantial volume of interstate commerce.

343.    Keurig's tying arrangement will have the effect of: (i) inhibiting or preventing the sale of Competing Portion Packs; (ii) decreasing research and investment by Competing Portion Packs manufacturers in the Compatible Portion Packs Market; (iii) discouraging or preventing new entry into the Compatible Portion Packs Market; (iv) maintaining supracompetitive K-Cup

81

Branded Portion Packs prices and increasing average prices overall to consumers; (v) reducing the amount of consumer choice for purchasers of 2.0 Brewers, particularly those with a preference for Competing Portion Packs; (vi) allowing Keurig to coerce competitors and third parties to take licenses from, and pay royalties to, Keurig; and (vii) increasing Keurig's share and monopoly power over the Compatible Portion Packs Market.

344.    The anticompetitive effects of Keurig's conduct outweigh any procompetitive benefits, if any, particularly given that Keurig has made clear that exclusion of Competing Portion Packs is not necessary to allow consumers to take advantage of any advantage that will be offered by 2.0 Brewers.

345.    Keurig's tying arrangement is intended to maintain and increase its monopoly power in the Portion Packs Market and Compatible Portion Packs Market.

346.    Keurig's tying arrangement threatens to cause Rogers substantial damages as a direct and proximate cause of this unlawful conduct, and indeed has already caused Rogers damages because Keurig has used this impending lockout as a basis to interfere with Rogers' business relationships, thereby diverting sales from Rogers to Keurig.

347.    Unless Keurig is enjoined from implementing the lock out feature of its proposed 2.0 Brewers, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its business, which would be lost not as a result of fair competition but rather as a result of Keurig's anticompetitive practice of tying its 2.0 Brewers to its Compatible Portion Packs. Given the nature of the irreparable harm to Rogers in the form of lost business, this harm will be difficult to quantify.

348.    In addition, Keurig's contractual agreements, which force distributors, suppliers, and retailers to purchase K-Cups from Keurig, or at least to not purchase Competing Portion Packs, if they wish to purchase K-Cup Brewers, constitute unlawful tying arrangements.

349.    Single Serve Brewers and Compatible Portion Packs are separate and distinct products. Similarly, K-Cup Brewers and K-Cup Portion Packs are separate and distinct products.

82

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

350.    Keurig has sufficient economic power in the Single Serve Brewer Market to coerce distributors, suppliers, and retailers to also purchase K-Cups even if they would prefer not to do so.

351.    Keurig's tying arrangements affect a significant volume of interstate commerce, and have the effect of substantially foreclosing competition in the Compatible Portion Pack Market by virtue of reducing the number of potential distributors, suppliers, and retail customers for whom Competing Portion Pack manufacturers can compete.   Moreover, these tying arrangements allow Keurig to maintain supracompetitive prices for K-Cups that are ultimately passed on to end customers, who are also harmed by virtue of having fewer beverage options available at lower price points because of Keurig's conduct.

352.    Keurig's tying arrangements have caused Rogers substantial damages as a direct and proximate cause of this unlawful conduct because Keurig has foreclosed Plaintiffs from competing for potential distributors, suppliers, and retail customers and deprived Rogers of sales channels to end customers, for reasons having nothing to do with the merits of Keurig's or Rogers' products.

353.    Keurig's agreements requiring that companies purchasing K-Cups not purchase Competitive Brewers also constitute an unlawful tie that exploits Keurig's market power in the Compatible Portion Pack Market.   This tie injures Rogers, other Competing Portion Pack manufacturers, and consumers because it reduces the ability for companies to produce or support new Competing Portion Pack manufacturers that could open up competition between K-Cups and Competing Portion Packs.

## SEVENTH CLAIM FOR RELIEF

**Anticompetitive Product Redesign**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

354.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 353 as fully set forth herein.

83

355.    As detailed above, Keurig has monopoly power in the Single Serve Brewers Market, Portion Packs Market, and Compatible Portion Packs Market, including the power to control prices and exclude competition.

356.    As alleged herein, Keurig has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in the Portion Packs Market and Compatible Portion Packs Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

357.    Keurig has further threatened to willfully and intentionally exclude competition from the Portion Packs Market and Compatible Portion Packs Market through the use of anticompetitive and exclusionary interactive lock out technology intended to render Competing Portion Packs incompatible with 2.0 Brewers.

358.    Keurig has expressed a strategy to eliminate alternative K-Cup Brewers by replacing prior generations of K-Cup Brewers with 2.0 Brewers, thereby locking in consumers and forcing them to use K-Cup Branded Portion Packs exclusively.

359.    On information and belief, the lock out feature of the proposed 2.0 "interactive technology" will not materially benefit consumers, but rather will harm consumers by resulting in reduced availability of preferred brands and increased pricing of available products. Any purported consumer benefit asserted by Keurig for this lock out technology is pretextual, particularly given that Keurig has made clear that the technology could be introduced without locking out Competing Portion Packs.

360.    Through the threat of the new technology, Keurig seeks to force Competing Portion Packs manufacturers to take a purported "license" from and to pay royalties to, Keurig in order to avoid the exclusionary effects of the new technology.

361.    Keurig also has sought to leverage the threat of the exclusionary effects of "interactive technology" to cause distributors and retailers to stop dealing with Keurig's competitors, including Rogers.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

362.    Unless Keurig is enjoined from implementing the lock out feature of its proposed 2.0 Brewers and using such redesign as a threat to Rogers' customers and potential customers, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its business and goodwill, which would be lost not as a result of fair competition but rather as a result of Keurig's anticompetitive product redesign and threats.    Given the nature of the irreparable harm to Rogers in the form of lost business and goodwill, this harm will be difficult to quantify.

## EIGHTH CLAIM FOR RELIEF

### Conspiracy to Monopolize
### Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2

363.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 362 as if fully set forth herein.

364.    As detailed above, Keurig has monopoly power in the Single Serve Brewer, Portion Pack Market, and Compatible Portion Pack Market, including the power to control prices and exclude competition.

365.    Keurig willfully and intentionally conspired with competitor roasters and coffee brands to monopolize the Portion Pack and Compatible Portion Pack Markets.

366.    Keurig and its licensees accomplished this by entering into multi-year, exclusionary agreements which prevent competitor roasters or coffee brands from licensing trademarks or entering into agreements with Keurig's competitors.

367.    Co-conspirators entered into these agreements with the knowledge and agreement that distributors and other resellers will be required to enter into, or already have entered into, agreements that limit their freedom to do business outside of specified authorized locations, thereby restraining the ability of Competing Portion Pack manufacturers to enter into contracts with distributors or other resellers.

368.    These restrictions regarding where and how K-Cups can be sold also allow Keurig to maintain supracompetitive prices across licensed brands by controlling output, which reduces

85

the competitor roaster or coffee brands' incentives to enter into deals with Competing Portion Pack manufacturers and creates an economic incentive for these co-conspirators to restrain competition from Competing Portion Pack manufacturers and to induce Competing Portion Pack manufacturers to enter into "license" agreements with Keurig that would require the Competing Portion Pack maker to permit Keurig to allocate the markets for Competing Portion Packs and to raise rivals' costs through the payment of an illegitimate "royalty."

369.   Keurig and its licensees' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of restraining competition from Competing Portion Pack manufacturers in order to restrain price competition in the Portion Pack and Compatible Portion Pack Markets.

## NINTH CLAIM FOR RELIEF

**Conspiracy, Concerted Refusals to Deal & Group Boycott**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

370.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 369 as if fully set forth herein.

371.   As detailed above, Keurig has monopoly power in the Single Serve Brewer, Portion Pack, and Compatible Portion Pack Markets, including the power to control prices and exclude competition.

372.   Keurig has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified concerted refusal to deal agreements with competitor roasters, competitor beverage brands, distributors, and retailers.

373.   Specifically, Keurig has effectively restrained, and further threatens to restrain, competition in the Portion Pack and Compatible Portion Pack Markets by:

   a.   conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to refuse to deal with Competing Portion Pack manufacturers; and

86

       b.      coercing distributors and retailers to enter into anticompetitive agreements to refuse to deal with Competing Portion Pack manufacturers.

374.    These agreements constitute unlawful concerted refusals to deal because two or more unaffiliated companies have unreasonably agreed not to deal with Competing Portion Pack manufacturers.  These agreements also constitute unlawful group boycotts because they are designed to induce Competing Portion Pack manufacturers to become "licensed" or "authorized" by Keurig.  Indeed, Keurig has repeatedly made public statements that its business objective is to "convert" unlicensed suppliers to licensed entities.

375.    This web of agreements refusing to deal with Competing Portion Pack manufacturers cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Keurig does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers.  Thus, Keurig's refusals to deal serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Keurig.

376.    These concerted refusals to deal have unreasonably restrained trade and have permitted Keurig to maintain its monopoly power over the Portion Pack and Compatible Portion Pack Markets.

### TENTH CLAIM FOR RELIEF

**Attempted Monopolization In The Alternative**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

377.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 376 as fully set forth herein.

378.    As detailed above, Keurig has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the Portion Packs Market and Compatible Portion Packs Market, including the power to control prices and exclude competition.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

379.   Keurig has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Portion Packs Market and Compatible Portion Packs Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

380.   Keurig's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Portion Packs Market and Compatible Portion Packs Market.  Keurig's anticompetitive conduct presents a dangerous probability that Keurig will succeed, to the extent it has not already, in its attempt to monopolize the Portion Packs Market and Compatible Portion Packs Market.  Indeed, market analysts have estimated that Keurig has recaptured two-thirds of the market share it had lost since the introduction of Competing Portion Packs, bringing its total share of Competing Portion Packs to 95% since Keurig's introduction of the 2.0 Brewer.

381.   As a direct, foreseeable, and proximate result of Keurig's anticompetitive and monopolistic conduct, Rogers has been injured in its business with resultant damages in amounts to be proven at trial.  In particular, Rogers has been substantially foreclosed from competing in the Portion Packs Market and Compatible Portion Packs Market; Rogers has had to incur substantial costs and attorneys' fees to defend against the baseless patent litigation pursued by Keurig; and Rogers has lost business as a result of Keurig's interference with its relationships with retailers and distributors and its claims that Competing Portion Packs will be incompatible with 2.0 Brewers.

382.   As a direct, foreseeable, and proximate result of Keurig's anticompetitive and monopolistic conduct, competition, suppliers, retailers, distributors, commercial customers, and consumers in the Portion Pack and Compatible Portion Packs Markets have been harmed by, among other things: (1) Keurig's ability to charge supracompetitive prices for K-Cups; and (2) the reduced output and availability of consumers' preferred Compatible Portion Packs.

88

## ELEVENTH CLAIM FOR RELIEF

### Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

383.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 382 as fully set forth herein.

384.    Defendant's "Keurig Brewed" campaigning has conveyed false and/or misleading statements to millions of consumers.  These false and misleading statements include, but are not limited to insinuating that Rogers' Portion Packs are unsafe; stating that Rogers' Portion Packs will void the warranty; stating that Keurig does not test other products when such testing has often revealed that competing products are of equal or greater quality; suggesting that the Keurig 2.0 has greater variety than the 1.0; stating that the Keurig 2.0 can automatically select brew settings; displaying an "Oops" message that blames Competing Portion Pack manufacturers for Keurig's decision not to brew all Compatible Portion Packs and suggesting that the Keurig 2.0 will be damaged by Competing Portion Packs.

385.    Defendant's retailer marketing campaign has made false and/or misleading statements directly to virtually all of Rogers actual and potential customers.  These false and misleading statements include, but are not limited to stating that consumers desired the Keurig 2.0 carafe brewing feature, while withholding information on customer preference showing that the carafe brewing feature was not desired; suggesting that the Keurig 2.0 could automatically detect the beverage type; and suggesting that the lock out was necessary to enable carafe brewing.  Additionally, retailers were exposed to the consumer messaging.

386.    Keurig's false and misleading statements were made in interstate commerce.

387.    These statements are likely to mislead, and in fact, has misled certain of Rogers' potential customers and thereby negatively influenced their purchasing decisions with regard to Rogers' products.

388.    Through these false and misleading statements, Keurig has caused injury to Rogers both through decreased sales and a loss of goodwill associated with Rogers' products.

89

Injury to Rogers is likely to continue and mount as Keurig's false and misleading advertising continues.

**TWELFTH CLAIM FOR RELIEF**

**Violation of the Cartwright Act, Cal. Bus. and Prof. Code §§ 16720, et seq.**

389.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 388 as fully set forth herein.

390.    Each of the types of conduct described below is a combination of capital, skill or acts by two or more persons for the purpose of creating or carrying out restrictions in trade or commerce as required by Cal. Bus. and Prof. Code § 16720:

   a.    entering into anticompetitive exclusive agreements with distributors and retailers that restrain market entry, exclude competitors, and unreasonably restrain competition;

   b.    conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, unreasonably restrain competition, allocate markets, and limit output;

   c.    coordinating with retailers and distributors by making false and disparaging comments to consumers regarding Rogers' Portion Packs and their compatibility with 2.0 Brewers, performance, safety, and quality in order to perpetuate Keurig's Portion Pack and Compatible Cup Market monopolies;

   d.    threatening to unreasonably restrain competition through the introduction of technology by way of an exclusionary contract with Sun Chemical for the supply of taggant ink used in 2.0 K-Cup lids that unnecessarily and unjustifiably excludes competitors from the Compatible Portion Packs Market and that cannot be justified based on any legitimate, non-pretextual consumer benefit; and

90

> e.   entering into license agreements with manufacturers of Competing Portion Packs that, among other things, restrict potential brand licensing and other distributor networks for Rogers and other potential Competing Portion Pack suppliers.

### THIRTEENTH CLAIM FOR RELIEF

#### Common Law Unfair Competition

391.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 390 as fully set forth herein.

392.   The conduct constituting violations of Sections 2 of the Sherman Act and Section 43(a) of the Lanham Act set forth above also constitute violations of common law tort of unfair competition.

### FOURTEENTH CLAIM FOR RELIEF

#### Violation of California False Advertising Law §§17500, *et seq.*

393.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 392 as fully set forth herein.

394.   Through its Keurig Brewed and retailer marketing campaign, Keurig intends to sell K-Cups, Single Serve Brewers, and other products and services related to single serve coffee brewing.

395.   Keurig and/or its employees caused and will continue to cause the Keurig Brewed, retailer marketing, and other information to be publicly disseminated in California.

396.   That publicly disseminated material does contain and will continue to contain statements untrue and/or misleading statements that Defendant knew and/or should have, by the exercise of reasonable care, known, to be untrue and/or misleading.

397.   As a result, Rogers has suffered and will suffer injury and has lost and will continue to lose money and /or property, including, but not limited to, a loss of revenue, increased advertising costs and increased customer support costs.

REDACTED
FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

## FIFTEENTH CLAIM FOR RELIEF

**Violation of the Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200 et seq.**

398.   Plaintiff repeats and reasserts each of the allegations contained in paragraphs l through 397 as fully set forth herein.

399.   Section 17200, *et seq.* of the California Business & Professions Code is written in the disjunctive and broadly covers three varieties of unfair competition – acts that are unlawful, or unfair, or fraudulent.   The statute's intent and purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.

400.   Defendant is a "person" within the meaning of California Business & Professions Code § 17201.

401.   As alleged herein, Keurig's conduct constitutes "unfair" business practices.   A practice may be deemed unfair, even if not specifically proscribed by some other law.   Conduct that significantly threatens or harms competition, or threatens an incipient violation of an antitrust law, may be deemed to be "unfair."

402.   As alleged herein, Keurig's anticompetitive conduct is also "unlawful."   Within the meaning of § 17200, virtually any violation of any civil or criminal federal, state or municipal, statutory, regulatory, court-made, or local law can serve as a predicate for an "unlawful" claim.

403.   As alleged herein, Keurig's anticompetitive conduct is also "fraudulent."   Within the meaning of § 17200, a practice is fraudulent if members of the public are likely to be deceived.   The act prohibits true statements made in a deceptive manner.   There is no scienter or reliance requirement under the act.

404.   By reason of, and as a direct and proximate result of Keurig's unfair, unlawful, and fraudulent practices and conduct, Rogers has suffered, and will continue to suffer, financial injury to its business or property.

405.   Keurig's unfair and unlawful conduct has caused harm to Rogers, competition, and consumers.   Unless Keurig is enjoined from further engaging in this anticompetitive

conduct, Rogers will suffer irreparable injury in the form of a loss of a significant percentage of its business and goodwill, which would be lost not as a result of fair competition but rather as a result of Keurig's anticompetitive practices.  Given the nature of the irreparable harm to Rogers in the form of lost business and goodwill, this harm will be difficult to quantify.

406.    A substantial amount of the actions giving rise to the claims and the harm alleged herein occurred in California.

## SIXTEENTH CLAIM FOR RELIEF

### Intentional Interference with Prospective Economic Advantage

407.    Plaintiff repeats and reasserts each of the allegations contained in paragraphs 1 through 406 as fully set forth herein.

408.    Keurig knew that its distributor and retailer customers also were the customers or potential customers of the manufacturers of Competing Portion Packs, including Rogers.  Indeed, Keurig knows that certain of these customers are also Rogers' customers.

409.    With this knowledge, Keurig has intentionally undertaken at least the following acts with malice and with the intent of disrupting Rogers' business relationship with these customers and potential customers by, for example, inducing them to breach their contracts with Rogers and/or refrain from doing business with Rogers:

  a.  Keurig made intentionally false and disparaging statements to Rogers' customers and potential customers regarding the quality of Rogers' Competing Portion Packs;

  b.  Keurig encouraged Rogers' customers to refrain from making purchases from Rogers or to make less purchases from Rogers by claiming that Rogers' Competing Portion Packs would not be compatible with Keurig's forthcoming 2.0 Brewers; and

  c.  Keurig vigorously pursued objectively baseless patent litigation against Rogers and other competitors in which it falsely maintained that consumers infringed Keurig's patents by using Rogers' products.

93

410.   Such actions have disrupted Rogers' relationships with both customers and potential customers by causing them to refrain from making purchases or to purchase less of Rogers' Competing Portion Packs and by causing a loss of goodwill with regard to Rogers and its products.

411.   As a result of Keurig's conduct, Rogers has suffered damages in an amount to be proven at trial.

## SEVENTEENTH CLAIM FOR RELIEF

### Intentional Interference with Contractual Relations Under California Law

412.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 411 as if fully set forth herein.

413.   Keurig has interfered with Rogers' business relations by confronting retail customers with its plan to lock out Competing Portion Packs through its introduction of the Keurig 2.0 Brewers and by attempting to dissuade those retailers from doing business with Rogers.

414.   Keurig, aware of Rogers' reasonable expectation of entering into a valid business relationship with these retail customers, intentionally interfered without justification or privilege with that prospective business relationship by making the statements described above, causing injury to Rogers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests:

A.   Pursuant to 28 U.S.C. § 2201, a declaration that Keurig has monopolized, or in the alternative, attempted to monopolize; created unreasonable and unenforceable restraints of trade through exclusive dealing agreements; conspired with its licensees to monopolize the Portion Pack Market and Compatible Portion Pack Market; unlawfully tied sales of Keurig 2.0 Brewers to K-Cup Branded Portion Packs; and leveraged its monopoly power in the Single Serve Brewers Market to monopolize the Compatible Portion Packs Market and the Portion Packs Market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the

94

Clayton Act, 15 U.S.C. § 14, the Cartwright Act, Cal. Bus. and Prof. Code §§ 16720, et seq. and the California Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200 et seq.;

      B.      Pursuant to 28 U.S.C. § 2201, a declaration that Keurig has engaged in patent misuse and a declaration that Keurig's brewer and method patents are unenforceable as to Rogers' OneCups;

      C.      Pursuant to 15 U.S.C. § 26, Defendant, its subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing the unlawful acts in violation of the Sherman Act, the Lanham Act, 15 U.S.C. § 1125(a), the Cartwright Act, Cal. Bus. and Prof. Code §§ 16720, et seq. and the California Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200 et seq., including but not limited to the implementation of the announced 2.0 Brewer lock out technology that threatens to block Competing Portion Packs from working in 2.0 Brewers, the tying of sales of 2.0 K-Cups to sales of 2.0 Brewers, and the false misrepresentations to Rogers' potential customers regarding the quality of Rogers' Compatible Portion Packs;

      D.      Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or proper based upon this Court's declaratory judgments;

      E.      Damages sustained to Rogers, as provided by the federal and state antitrust and unfair competition laws, and a joint and several judgment in favor of Plaintiff shall be entered against Defendant in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

      F.      Pre-judgment and post judgment interest at the maximum legal rate;

      G.      Rogers' costs, expenses, and reasonable attorneys' fees in bringing this action;

      H.      An award of punitive damages; and

      I.      Such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues triable by jury.

95

Dated:  November 25, 2014       Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: _____ /s/ Daniel Johnson, Jr. _____

Daniel Johnson, Jr.(admitted *pro hac vice*)
One Market,Spear Street Tower
San Francisco, CA 94105
Tel:  (415) 442-1000
Fax: (415) 442-1001

*Attorneys for JBR, Inc. (d/b/a Rogers Family Company)*

96